IN THE SUPREME COURT OF NORTH CAROLINA

No. 342PA19-3

Filed 28 April 2023

JABARI HOLMES, FRED CULP, DANIEL E. SMITH, BRENDON JADEN PEAY, AND PAUL KEARNEY, SR.

v.

TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives; PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; DAVID R. LEWIS, in his official capacity as Chairman of the House Select Committee on Elections for the 2018 Third Extra Session; RALPH E. HISE, in his official capacity as Chairman of the Senate Select Committee on Elections for the 2018 Third Extra Session; THE STATE OF NORTH CAROLINA; and THE NORTH CAROLINA STATE BOARD OF ELECTIONS

On discretionary review pursuant to N.C.G.S. § 7A-31 from the judgment entered on 17 September 2021 by a divided three-judge panel of the Superior Court, Wake County, holding that S.B. 824 violates Article I, Section 19 of the North Carolina Constitution and permanently enjoining that law. On 16 December 2022, this Court affirmed the judgment, and that mandate was issued on 5 January 2023. On 3 February 2023, this Court allowed a petition for rehearing pursuant to N.C. R. App. P. 31. Heard in the Supreme Court on 15 March 2023.

*Southern Coalition for Social Justice, by Jeffrey Loperfido and Hillary Harris Klein; and Jane O'Brien, pro hac vice, Paul D. Brachman, pro hac vice, and Andrew J. Ehrlich, pro hac vice, for plaintiff-appellees.*

*Nicole J. Moss, David H. Thompson, pro hac vice, Peter A. Patterson, pro hac vice, Joseph O. Masterman, pro hac vice, John W. Tienken, pro hac vice, Nicholas A. Varone, pro hac vice, and Nathan A. Huff, for legislative defendant-appellants.*

*Joshua H. Stein, Attorney General, by Terence Steed, Special Deputy Attorney General, Laura McHenry, Special Deputy Attorney General, and Mary Carla Babb, Special Deputy Attorney General, for defendant-appellants State of North Carolina and North Carolina State Board of Elections.*

BERGER, Justice.

There is no legal recourse available for vindication of political interests, but this Court is yet again confronted with "a partisan legislative disagreement that has spilled out . . . into the courts." *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 783 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 128 S. Ct. 1610 (2008). This Court once again stands as a bulwark against that spillover, so that even in the most divisive cases, we reassure the public that our state's courts follow the law, not the political winds of the day.

It is well settled that the proper exercise of judicial power requires great deference to acts of the General Assembly, as the legislature's enactment of the law is the sacrosanct fulfillment of the people's will. *See Pope v. Easley*, 354 N.C. 544, 546, 556 S.E.2d 265, 267 (2001) ("[T]he General Assembly . . . functions as the arm of the electorate."). With that basic principle in mind, we are confronted here with a simple question: does S.B. 824 violate the meaningful protections set forth in Article I, Section 19 of the North Carolina Constitution? Because it does not, we reverse and remand to the trial court for dismissal of this action with prejudice.

## I.    Background

In November 2018, the people of North Carolina amended our Constitution to require that "[v]oters offering to vote in person shall present photographic identification before voting." N.C. Const. art. VI, § 2(4).  The people commanded "[t]he General Assembly [to] enact general laws governing the requirements of such photographic identification, which may include exceptions."  *Id*.  The General Assembly thereafter complied by passing S.B. 824, now codified in Chapter 163 of our General Statutes.  *See* An Act to Implement the Constitutional Amendment Requiring Photographic Identification to Vote, S.L. 2018-144, 2019 N.C. Sess. Laws 72.

 Pursuant to S.B. 824, registered voters are required to present one of a multitude of acceptable forms of identification prior to casting a ballot.  These include a valid, unexpired: (1) North Carolina driver's license; (2) North Carolina nonoperator's identification; (3) United States passport; (4) North Carolina voter identification card; (5) student identification card issued by any statutorily-defined eligible institution; (6) employee identification card issued by a state or local government entity; or (7) out-of-state driver's license or nonoperator's identification, provided that the voter's registration was within ninety days of the election.  N.C.G.S. § 163-166.16(a)(1) (2021).  These forms of identification are acceptable even if expired, so long as they have been expired for one year or less.  *Id*.

In addition, if voters lack one of the aforementioned identifications, they may

also present any of the following identifications regardless of their expiry: (1) a military identification issued by the United States government; (2) a veterans identification card issued by the United States Department of Veterans Affairs; (3) a tribal enrollment card issued by a State or federally recognized tribe; or (4) an identification card issued by a department, agency, or entity of the United States or North Carolina for a government public assistance program. N.C.G.S. § 163-166.16(a)(2) (2021). Registered voters over the age of sixty-five may present *any* of the aforementioned identifications listed in sections (a)(1) and (2) regardless of expiry, so long as the identification was unexpired on the date of the registered voter's sixty-fifth birthday. N.C.G.S. § 163-166.16(a)(3) (2021).

If a registered voter lacks one of the various types of acceptable identifications, the law also requires that "[t]he county board of elections . . . issue without charge voter photo identification cards upon request to registered voters." N.C.G.S. § 163-82.8A(a) (2021). To receive a free photo identification card, a registered voter need only provide "the registered voter's name, the registered voter's date of birth, and the last four digits of the voter's social security number." N.C.G.S. § 163-82.8A(d)(1) (2021). These free identification cards are valid for ten years, which, when coupled with the one-year expiration exception provided by N.C.G.S. § 163-166.16(a)(1), means a voter can use a free photo identification card for a period of eleven years.

N.C.G.S. § 163-82.8A(a).[1]

The law further provides a host of exceptions for any registered voter who, despite the wide range of acceptable identifications, and despite the availability of freely issued identification cards, nevertheless "does not produce an acceptable form of identification." N.C.G.S. § 163-166.16(d) (2021). First, if a registered voter cannot produce acceptable identification, he or she "may cast a provisional ballot" that will be counted "if the registered voter brings an acceptable form of photograph identification . . . to the county board of elections no later than the end of business on the business day prior to the canvass by the county board of elections as provided in G.S. 163-182.5." N.C.G.S. § 163-166.16(c) (2021). In addition, a registered voter is not required to present any acceptable form of photo identification if that failure is due to: (1) "a religious objection to being photographed;" (2) "a reasonable impediment that prevents the registered voter from presenting a photograph identification;" or (3) "being a victim of a natural disaster occurring within 100 days before election day that resulted in a disaster declaration by the President of the United States or the Governor of this State." N.C.G.S. § 163-166.16(d)(1)–(3).

The "reasonable impediment" exception allows the registered voter to cast a provisional ballot so long as they complete a reasonable impediment declaration

---

[1] The trial court entered an erroneous finding of fact that the free identification cards expire after one year. In its previous opinion in this case, the majority of this Court repeated this erroneous finding. *Holmes v. Moore*, 383 N.C. 171, 199, 881 S.E.2d 486, 507 (2022) ("[F]ree NC Voter IDs had a one-year expiration date.").

affidavit. N.C.G.S. § 163-166.16(d)(2). The law mandates that the State Board of Elections implement a reasonable impediment declaration form that, at a *minimum*, allows voters to identify any of the following as their reasonable impediment to presenting an acceptable ID:

> (1) Inability to obtain photo identification due to:
>
>> a. Lack of transportation.
>>
>> b. Disability or illness.
>>
>> c. Lack of birth certificate or other underlying documents required.
>>
>> d. Work schedule.
>>
>> e. Family responsibilities.
>
> (2) Lost or stolen photo identification.
>
> (3) Photo identification applied for but not yet received by the registered voter voting in person.
>
> (4) Other reasonable impediment. If the registered voter checks the "other reasonable impediment" box, a further brief written identification of the reasonable impediment shall be required, including the option to indicate that State or federal law prohibits listing the impediment.

N.C.G.S. § 163-166.16(e) (2021).

Any provisional ballot cast by a registered voter who fails to present an acceptable form of identification, but who nevertheless submits a reasonable impediment affidavit, must be counted as a valid ballot "unless the county board [of elections] has grounds to believe the affidavit is false." N.C.G.S. § 163-166.16(f)

(2021).

This law is one of the least restrictive voter identification laws in the United States. *See N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 310 (4th Cir. 2020) ("Indeed, the 2018 [North Carolina] Voter-ID Law is more protective of the right to vote than other states' voter-ID laws that courts have approved."); *see also Greater Birmingham Ministries v. Sec'y of State for Alabama*, 992 F.3d 1299 (11th Cir. 2021) (upholding a more restrictive voter identification law); *Lee v. Va. State Bd. of Elections*, 843 F.3d 592 (4th Cir. 2016) (same); *South Carolina v. United States*, 898 F. Supp. 2d. 30 (D.D.C. 2012) (same).

In sum, S.B. 824 permits registered voters to present a multitude of acceptable identifications, including expired identifications, and requires the State to provide free voter identification cards to any registered voter. If a registered voter leaves their identification at home or otherwise fails to present it on voting day, he or she can cast a provisional ballot which will be counted if the identification is later presented to the county board of elections. Even if a registered voter still somehow fails to obtain or otherwise possess an acceptable form of identification, the law permits him or her to cast a provisional ballot that will be counted so long as they do not provide false information in the reasonable impediment affidavit. Essentially, North Carolina's photo identification statute does not require that an individual present a photo identification to vote.

Nevertheless, shortly after passage of S.B. 824, plaintiffs filed a facial

challenge to the legislation in Wake County Superior Court, alleging that the law violates numerous provisions of the North Carolina Constitution. Specifically, plaintiffs alleged the law: (1) violates Article I, Section 19 because it was enacted with discriminatory intent; (2) violates Article I, Section 19 because it unjustifiably and significantly burdens the fundamental right to vote; (3) violates Article I, Section 19 because it creates different classes of voters who will be treated disparately in their access to their fundamental right to vote; (4) violates Article I, Section 10 because it infringes on the right to participate in free elections; (5) violates Article I, Section 10 because it conditions the fundamental right to vote on the possession of property; and (6) violates Article I, Sections 12 and 14 because it infringes upon the rights of assembly, petition, and freedom of speech.

Plaintiffs moved for a preliminary injunction to enjoin implementation and enforcement of S.B. 824. Defendants moved to dismiss plaintiffs' claims, and the three-judge panel assigned to the case entered an order denying plaintiffs' motion for a preliminary injunction and dismissing all but the first of plaintiffs' claims.[2] Plaintiffs appealed the trial court's denial of the preliminary injunction and the Court of Appeals reversed the panel's decision. *Holmes v. Moore*, 270 N.C. App. 7, 36, 840 S.E.2d 244, 266–67 (2020).

Thereafter, the panel issued the preliminary injunction and held a trial on the

---

[2] As plaintiffs did not appeal the dismissal of these claims, plaintiffs' only remaining argument is their discriminatory intent claim under Article I, Section 19.

merits of plaintiffs' equal protection claim. A majority of the three-judge panel decided in plaintiffs' favor, holding that S.B. 824 violates Article I, Section 19 of the North Carolina Constitution because it was enacted with discriminatory intent. The panel then issued an injunction permanently enjoining implementation of the law.

One judge on the panel dissented, concluding that plaintiffs had failed to meet their burden of proving the law was enacted with discriminatory intent. Defendants timely appealed to the Court of Appeals—however, after briefing began, but before the Court of Appeals could consider the case, this Court granted plaintiffs' petition for expedited review prior to a determination by the Court of Appeals.

As is relevant to our consideration of this case, a separate group of plaintiffs challenged S.B. 824 in federal court prior to the present matter reaching this Court. Plaintiffs there made nearly identical arguments, asserting that the voter identification law violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it was enacted with discriminatory intent. On the plaintiffs' motion, the district court granted a preliminary injunction because it found that the plaintiffs were likely to succeed on the merits of their constitutional claim. *N.C. State Conf. of the NAACP v. Cooper*, 430 F. Supp. 3d. 15, 54 (M.D.N.C. 2019).

The defendants appealed in that federal case, and the Fourth Circuit, in a lengthy and detailed opinion, held that *this very law* was not enacted with discriminatory intent and reversed the district court's decision to invalidate S.B. 824

because of "fundamental legal errors that permeate[d]" the district court's order. *Raymond*, 981 F.3d at 310–11. Most remarkably, the Fourth Circuit concluded that "the district court improperly reversed the burden of proof and disregarded the presumption of legislative good faith," and that when the correct legal principles were applied to the plaintiffs' arguments, "the remaining evidence in the record fails to meet the Challengers' burden." *Id.* at 311.

On appeal to this Court in the present matter, defendants argued that the panel erred in finding the law was enacted with discriminatory intent because the panel improperly reversed the burden of proof and disregarded the presumption of legislative good faith. Defendants further contended that, as indicated by the Fourth Circuit in *Raymond*, plaintiffs' challenge could not be sustained under the correct application of the relevant legal principles. In December 2022, after an election that would change the composition of this Court, but prior to the expiration of the terms of two outgoing justices, the majority—half of which was composed of those two justices—issued an opinion affirming the lower court's issuance of the injunction. *Holmes v. Moore*, 383 N.C. 171, 881 S.E.2d 486 (2022). In so doing, the majority claimed to apply federal precedent but declined to follow the Fourth Circuit's guidance from *Raymond*, the federal case which found that S.B. 824 did not violate the federal Equal Protection Clause. *Id.* at 189, 881 S.E.2d at 500.

Following this Court's decision, defendants timely filed a petition for rehearing, arguing that the majority of this Court overlooked or misapprehended

relevant points of fact and law. This Court determined that petitioners had satisfied the requirements of Rule 31 of the Rules of Appellate Procedure and ordered rehearing in an order entered 3 February 2023. After supplemental briefing and oral argument, and upon rehearing pursuant to Rule 31, we withdraw the prior decision reported at 383 N.C. 171, 881 S.E.2d 386 "and treat the case before us as a hearing de novo on the issue raised." *Alford v. Shaw*, 320 N.C. 465, 467, 358 S.E.2d 323, 324 (1987) (citing *Trust Co. v. Gill, State Treasurer*, 392 N.C. 164, 237 S.E.2d 21 (1977); *Clary v. Bd. of Educ.*, 286 N.C. 525, 212 S.E.2d 160 (1975)).

## II. Standard of Review

"Whether a statute is constitutional is a question of law that this Court reviews de novo." *State v. Grady*, 372 N.C. 509, 521–22, 831 S.E.2d 542, 553 (2019) (quoting *State v. Romano*, 369 N.C. 678, 685, 800 S.E.2d 644, 649 (2017)). "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *Bartley v. City of High Point*, 381 N.C. 287, 293, 873 S.E.2d 525, 532 (2022) (quoting *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 354 (2009)). "In exercising de novo review, we presume that laws enacted by the General Assembly are constitutional, and we will not declare a law invalid unless we determine that it is unconstitutional beyond reasonable doubt." *Cooper v. Berger*, 370 N.C. 392, 413, 809 S.E.2d 98, 111 (2018) (quoting *State v. Berger*, 368 N.C. 633, 639, 781 S.E.2d 248, 252 (2016)).

"[T]he trial court's findings of fact are conclusive on appeal if supported by

competent evidence, even if the evidence is conflicting." *State v. Parisi*, 372 N.C. 639, 649, 831 S.E.2d 236, 243 (2019) (cleaned up). While "a [trial] court's finding[s] of fact on the question of discriminatory intent [are] reviewed for clear error," when "a finding of fact is based on the application of an incorrect burden of proof, the finding cannot stand." *Abbott v. Perez*, 138 S. Ct. 2305, 2326 (2018). "[W]hether the court applied the correct burden of proof is a question of law subject to plenary review." *Id.*

## III.   Analysis

### A. Introduction

"Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730, 94 S. Ct. 1274, 1279 (1974)). "[I]t should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2348 (2021). Indeed, "the integrity of the election process empowers the state to enact laws to prevent voter fraud before it occurs, rather than only allowing the state to remedy fraud after it becomes a problem." *Fisher v. Hargett*, 604 S.W.3d 381, 404 (Tenn. 2020) (cleaned up).

The Supreme Court of the United States has recognized that "every voting rule imposes a burden of some sort." *Brnovich*, 141 S. Ct. at 2338. "The burden of acquiring, possessing, and showing a free photo identification is simply not severe." *Crawford*, 553 U.S. at 209, 128 S. Ct. at 1627 (Scalia, J., concurring). "[T]he inconvenience of making a trip to [a government office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Id.* at 198, 128 S. Ct. at 1621. *See also Milwaukee Branch of NAACP v. Walker*, 2014 WI 98, ¶ 4, 357 Wis. 2d 469, 475–76, 851 N.W.2d 262, 265 ("[P]hoto identification is a condition of our times where more and more personal interactions are being modernized to require proof of identity with a specified type of photo identification. With respect to these familiar burdens, which accompany many of our everyday tasks, [a photo identification requirement] does not constitute an undue burden on the right to vote.").

## B. Judicial Review

Plaintiffs here have asserted that in enacting S.B. 824, the legislature acted "at least in part to entrench itself by burdening the voting rights of reliably Democrat[ ] African-American voters." Although the Supreme Court of the United States has recognized that "partisan motives are not the same as racial motives," *Brnovich*, 141 S. Ct. at 2349, plaintiffs contend that the mere allegation that race played some part in enactment of the law compels us to consider the effects S.B. 824 has on "reliably

Democrat" voters when evaluating intent of the legislature, and in doing so, to depart from our well-settled approach to reviewing the constitutionality of legislative acts. However, "[a] facial challenge must fail where the statute has a plainly legitimate sweep." *Crawford*, 553 U.S. at 202, 128 S. Ct. at 1623 (cleaned up).

Under our Constitution, "power remains with the people and is exercised through the General Assembly, which functions as the arm of the electorate. An act of the people's elected representatives is thus an act of the people and is presumed valid *unless it conflicts with the Constitution.*" *Pope*, 354 N.C. at 546, 556 S.E.2d at 267; *see also State v. Strudwick*, 379 N.C. 94, 105, 864 S.E.2d 231, 240 (2021) ("[W]e presume that laws enacted by the General Assembly are constitutional." (quoting *Grady*, 372 N.C. at 521–22, 831 S.E.2d at 553)). "The Legislature alone may determine the policy of the State, and its will is supreme, except where limited by constitutional inhibition, which exception or limitation, when invoked, presents a question of power for the courts to decide. But even then the courts do not undertake to say what the law ought to be; they only declare what it is." *State v. Revis*, 193 N.C. 192, 195 136 S.E. 346, 347 (1927) (citation omitted).

The presumption of constitutionality is a critical safeguard that preserves the delicate balance between this Court's role as the interpreter of our Constitution and the legislature's role as the voice through which the people exercise their ultimate power. *Id.* ("To interpret, expound, or declare what the law is, or has been, and to

adjudicate the rights of litigants, are judicial powers; to say what the law shall be is legislative.").

To that end, "we will not declare a law invalid unless we determine that it is unconstitutional beyond a reasonable doubt." *Strudwick*, 379 N.C. at 105, 864 S.E.2d at 240 (quoting *Grady*, 372 N.C. at 522, 831 S.E.2d at 553). "In addressing the facial validity of [a statute], our inquiry is guided by the rule that a facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully." *State v. Bryant*, 359 N.C. 554, 564, 614 S.E.2d 479, 485 (2005) (cleaned up) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987)). To succeed in this endeavor, one who facially challenges an act of the General Assembly may not rely on mere speculation. Rather, "[a]n individual challenging the facial constitutionality of a legislative act must establish that no set of circumstances exists under which the act would be valid." *Id.* at 564, 614 S.E.2d at 486 (cleaned up).[3]

---

[3] Our dissenting colleague expresses skepticism of this Court's continued adherence to *Salerno*'s standard. However, the requirement that plaintiffs facially challenging a presumptively valid law carry this burden is far from "novel." Only eighteen months ago, our dissenting friend wrote, with added emphasis: "After all, it has been long established by this Court that an individual challenging the facial constitutionality of a legislative act must establish that *no* set of circumstances exists under which the act would be valid." *State v. Strudwick*, 379 N.C. 94, 108, 864 S.E.2d 231, 242 (2021) (quoting *Salerno*, 481 U.S. at 739, 107 S. Ct. at 2100).

Contrary to our friend's contention, our application of this standard to claims that a law was enacted with discriminatory intent is only "novel" in the sense that this Court has never before had the opportunity to address such a claim—the prior, withdrawn, and erroneous opinion in this matter notwithstanding. But, this Court's application of *Salerno*'s standard to facial challenges has not been questioned, until now. *See id.*; *State v. Grady*, 372 N.C. 509, 547, 831 S.E.2d 542, 570 (2019) (quoting and applying *Salerno*'s standard); *Kimberley Rice Kaestner 1992 Fam. Tr. v. N.C. Dep't. of Revenue*, 371 N.C. 133, 138, 814 S.E.2d 43, 47 (2018), *aff'd sub nom. N.C. Dep't of Revenue v. Kimberley Rice Kaestner 1992*

> [W]e emphasize that "the role of the legislature is to balance the weight to be afforded to disparate interests and to forge a workable compromise among those interests. The role of the Court is not to sit as a super legislature and second-guess the balance struck by the elected officials." Rather, this Court must "measure the balance struck by the legislature against the required minimum standards of the constitution."

*Id*. at 565, 614 S.E.2d at 486 (quoting *Harvey v. Edmisten*, 315 N.C. 474, 491, 340 S.E.2d 720, 731 (1986)).

## C. Equal Protection

The North Carolina Constitution, under which plaintiffs' claim is brought, provides in pertinent part that "[n]o person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin." N.C. Const. art. I, § 19. In essence, "[e]qual protection requires that all persons similarly situated be treated alike." *Blankenship v. Bartlett*, 363 N.C. 518, 521, 681 S.E.2d 759, 762 (2009) (quoting *Richardson v. N.C. Dep't of Corr.*, 345 N.C. 128, 134, 478 S.E.2d 501, 505 (1996)).

This Court's analysis of our Constitution's Equal Protection Clause has "generally follow[ed] the analysis of the Supreme Court of the United States in interpreting the corresponding federal clause."[4] *Id*. at 522, 681 S.E.2d at 762. Both

---

*Fam. Tr.*, 139 S. Ct. 2213 (2019) (same); *Hart v. State*, 368 N.C. 122, 131, 774 S.E.2d 281, 288 (2015) (same); *Bryant*, 359 N.C. at 564, 614 S.E.2d at 485 (same); *State v. Thompson*, 349 N.C. 482, 491, 508 S.E.2d 277, 281–82 (1998) (same).

[4] The Fourteenth Amendment to the United States Constitution provides in pertinent part that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The decisions of the Supreme Court of the United

provisions guarantee equal treatment for individuals, not equality of outcome. *See Frank v. Walker*, 768 F.3d 744, 754 (7th Cir. 2014). However, "in the construction of [a] provision of the State Constitution, the meaning given by the Supreme Court of the United States to even an identical term in the Constitution of the United States is, though highly persuasive, not binding upon this Court." *Blankenship*, 363 N.C. at 522, 681 S.E.2d at 762 (quoting *Bulova*, 285 N.C. at 474, 206 S.E.2d at 146).

State supreme courts are not bound by federal courts when interpreting their state constitutions, and the parties here correctly concede that principles of federalism do not require lock-stepping. *See* Jeffrey S. Sutton, *51 Imperfect Solutions, States and the Making of American Constitutional Law*, 16 (2018) ("Nothing compels the state courts to imitate federal interpretations of the liberty and property guarantees in the U.S. Constitution when it comes to the rights guarantees found in their own constitutions . . . . Our federal system gives state courts the final say over the meaning of their own constitutions.").

Thus, it is the duty of the Supreme Court of North Carolina alone to declare what the law is under our Constitution. *See Bayard v Singleton*, 1 N.C. 5 (1787). It follows that when a party challenges a presumptively valid act of the General Assembly under our Constitution's Equal Protection Clause, as in this case, we are in no sense bound to follow the analytical or evidentiary framework established by

States as to the construction and effect of . . . the Fourteenth Amendment to the Constitution of the United States are, of course, binding upon this Court." *Bulova Watch Co., Inc. v. Brand Distribs. of N. Wilkesboro, Inc.*, 285 N.C. 467, 474, 206 S.E.2d 141, 146 (1974).

the Supreme Court of the United States or any other federal court for resolving equal protection challenges under the federal Constitution.

Accordingly, pursuant to both the Fourteenth Amendment to the United States Constitution and Article I, Section 19 of the North Carolina Constitution, we reaffirm that "[a] statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race." *Washington v. Davis*, 426 U.S. 229, 241, 96 S. Ct. 2040, 2048 (1976). In addition, when a facially neutral statute is challenged, both proof of "a racially discriminatory purpose," *id.* at 239, 96 S. Ct. at 2047, and proof that the law actually "produces disproportionate effects," *Hunter v. Underwood*, 471 U.S. 222, 227, 105 S. Ct. 1916, 1920 (1985), are required to demonstrate the law's unconstitutionality. But a provision will not be declared unconstitutional "*solely* because it has a racially disproportionate impact." *Davis*, 426 U.S. at 239, 96 S. Ct. at 2047.

"Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott*, 138 S. Ct. at 2324 (citing *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481, 117 S. Ct. 1491, 1499 (1997)). Where a law is facially neutral, as here, the challenger faces an especially heavy burden of proving enactment of the law was motivated by discriminatory intent.

To meet this burden under the federal analytical framework, plaintiffs "must prove by a preponderance of the evidence that racial discrimination was a substantial

or motivating factor" in the enactment of the challenged legislation. *Hunter*, 471 U.S. at 225, 105 S. Ct. at 1918 (quoting *Underwood v. Hunter*, 730 F.2d 614, 617 (11th Cir. 1984)). In *Arlington Heights*, the Supreme Court of the United States established a non-exhaustive list of evidentiary sources plaintiffs may use to establish discriminatory intent under the federal Constitution. *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 97 S. Ct. 555 (1977). Whether the government action " 'bears more heavily on one race than another' may provide an important starting point," *Id.* at 266, 97 S. Ct. at 564 (quoting *Davis*, 426 U.S. at 242, 96 S. Ct. at 2049), however, "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Id.* at 264–65, 97 S. Ct. at 563. Thus, *Arlington Heights* commands federal courts to also consider "[t]he historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the challenged action's "legislative or administrative history." *Id.* at 267–68, 97 S. Ct. at 564–65.

However, plaintiffs' claim in the instant suit is brought pursuant to Article I, Section 19 of the North Carolina Constitution, not the Fourteenth Amendment of the United States Constitution. Specifically, plaintiffs argue that application of the *Arlington Heights* test produces an inference of discriminatory intent in the passage of S.B. 824 such that, even though the law is facially neutral, the law violates the Equal Protection Clause found in our state Constitution. But, plaintiffs' challenge,

whether analyzed under *Arlington Heights* or under our traditional standard, must fail.

The result below, which endorsed plaintiffs' argument, is not only contrary to the result reached by the Fourth Circuit in *Raymond*, the federal corollary to this suit which held S.B. 824 does not contravene the Fourteenth Amendment, but also "would have the potential to invalidate just about any voting rule a State adopts." *Brnovich*, 141 S. Ct. at 2343. To utilize such a subjective test "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433, 112 S. Ct. at 2063.

Constitutional deference and the presumption of legislative good faith caution against casting aside legislative policy objectives on the basis of evidence that could be fairly interpreted to demonstrate that a law was enacted in spite of, rather than because of, any alleged racially disproportionate impact. To that end, a challenge to a presumptively valid and facially neutral act of the legislature under Article I, Section 19 of the North Carolina Constitution cannot succeed if it is supported by speculation and innuendo alone.

It is well settled that this Court has required plaintiffs to produce proof beyond a reasonable doubt to invalidate a legislative action as violative of our state's Constitution. *See Strudwick*, 379 N.C. at 105, 864 S.E.2d at 240 ("[W]e will not declare a law invalid unless we determine that it is unconstitutional beyond a reasonable doubt." (quoting *Grady*, 372 N.C. at 522, 831 S.E.2d at 553)); *Hart v. State*,

368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015) ("Stated differently, a law will be declared invalid only if its unconstitutionality is demonstrated beyond a reasonable doubt."); *Baker v. Martin*, 330 N.C. 331, 334, 410 S.E.2d 887, 888 (1991) ("[E]very presumption favors the validity of a statute. It will not be declared invalid unless its unconstitutionality be determined beyond reasonable doubt." (quoting *Gardner v. Reidsville*, 269 N.C. 581, 595, 153 S.E.2d 139, 150 (1967))).

With the ability to declare a legislative act unconstitutional, courts wield a "delicate, not to say dangerous" power which is "antagonistic to the fundamental principles of our government." *State v. White*, 125 N.C. 674, 688, 34 S.E. 532, 536 (1899) (Clark, J., dissenting). The power to invalidate legislative acts is one that must be exercised by this Court with the utmost restraint, and the proof beyond a reasonable doubt standard is a necessary protection against abuse of such power by unprincipled or undisciplined judges.

This is not a novel or unique approach, as federal courts have acknowledged that overturning state legislative acts requires a challenger to meet a heightened burden. *See Plain Loc. Sch. Dist. Bd. of Educ. v. DeWine*, 486 F. Supp. 3d 1173, 1198 (S.D. Ohio 2020) ("[T]he 'party challenging the constitutionality of a statute bears the burden of proving that it is unconstitutional beyond a reasonable doubt.' " (quoting *Cleveland v. State*, 989 N.E.2d 1072, 1078 (Ohio Ct. App. 2013))); *Huffman v. Brunsman*, 650 F. Supp. 2d 725, 742 (S.D. Ohio 2008) ("[A] person challenging a statute must prove that the statute is unconstitutional beyond a reasonable doubt."

(citing *State v. Anderson*, 57 Ohio St. 3d 168, 171, 566 N.E.2d 1224, 1226 (1991)));
*Coal. for Equal Rights, Inc. v. Owens*, 458 F. Supp. 2d 1251, 1258 (D. Colo. 2006)
("Challengers to a state law 'bear the burden of proving it unconstitutional beyond a
reasonable doubt.'" (quoting *Mosgrove v. Town of Federal Heights*, 191 Colo. 1, 4, 543
P.2d 715, 717 (1975))).

Even in the context of "determining the federal constitutionality" of a state law
challenged under *Arlington Heights*, federal courts should "begin[ ] with the
presumption of constitutionality," should require the challengers to "demonstrate
that the Act is unconstitutional beyond a reasonable doubt," and "must accept" the
state's "plausible construction of the Act [if] that would result in a finding of
constitutionality." *Villanueva v. Carere*, 873 F.Supp. 434, 447 (D. Colo. 1994), *aff'd*,
85 F.3d 481 (10th Cir. 1996).

Therefore, we hold that to prevail on such a facial challenge to a state statute
under this state's traditional analytical framework, the challenger must prove beyond
a reasonable doubt that: (1) the law was enacted with discriminatory intent on the
part of the legislature, and (2) the law actually produces a meaningful disparate
impact along racial lines.

We reach this determination not out of disagreement with the federal courts'
analysis of these issues under the federal Equal Protection Clause. Rather, we reach
this decision because *Arlington Heights*' analytical framework is incompatible with
our state Constitution and this Court's precedent as it allows challengers to succeed

on such claims by proffering evidence that is by its very nature speculative, subjective, and thus, insufficient to meet the well-established burden of proof. The differing outcomes reached by the Fourth Circuit in *Raymond* and the trial court below highlight the subjective nature of the *Arlington Heights* test. The fact that different results can be reached using the *Arlington Heights* test suggests that personal biases and subjective interpretations concerning presumptively valid legislative acts can greatly influence outcomes in these types of cases. It is the objective application of legal principles that leads to consistent and fair judicial decisions. There, the *Arlington Heights* framework falls short.[5]

## D. Federal Precedent

With this in mind, we now turn our attention to the trial court's order permanently enjoining S.B. 824. Because the trial court below relied heavily on *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), it is appropriate to provide a brief review of that case. In addition, a proper review of the trial court's order requires a thorough analysis of *Abbott v. Perez*, 138 S. Ct. 2305 (2018) and *Raymond*, 981 F.3d 295.

---

[5] Our holding does not mean that the *Arlington Heights* test will not be appropriate in other circumstances in which the beyond a reasonable doubt standard does not apply. For example, it may remain a sound analytical framework for challenges to zoning or executive agency regulatory actions, which are the types of official action the test was designed to address. *See Arlington Heights*, 429 U.S. at 254, 97 S. Ct. at 558 ("[Plaintiffs] alleged that the denial [of a rezoning request] was racially discriminatory . . . ."). However, in the context of invalidating presumptively constitutional legislative action, our precedent is clear, and *Arlington Heights* is contrary to the overwhelming weight of authority in North Carolina.

### 1. *North Carolina State Conference of the NAACP v. McCrory*

In *McCrory*, the plaintiffs challenged various voting provisions contained in H.B. 589, a 2013 omnibus bill enacted by the North Carolina General Assembly that included voter identification provisions, arguing the law had been enacted with discriminatory intent. *McCrory*, 831 F.3d at 218.

The 2013 provision was enacted shortly after the Supreme Court of the United States "invalidated the preclearance coverage formula," a federal statutory mechanism that required North Carolina, and other states with histories of racially motivated voter suppression laws, to seek preclearance with the United States Department of Justice before enacting new voting laws. *Id.* at 216 (citing *Shelby County v. Holder*, 570 U.S. 529, 557, 133 S. Ct. 2612, 2631 (2013)). At the conclusion of trial, the district court found that the 2013 law was not enacted with discriminatory intent and entered judgment against the plaintiffs on all of their claims. *Id.* at 219.

On appeal, the Fourth Circuit noted that the "ultimate question" was whether "the legislature enact[ed] a law 'because of,' and not 'in spite of,' its discriminatory effect." *Id.* at 220. In concluding that the 2013 law was enacted because of its discriminatory effect, i.e., with discriminatory intent, the Fourth Circuit determined that the "undisputed" facts regarding the "sequence of events leading up to the challenged decision" were "devastating." *Id.* at 227 (quoting *Arlington Heights*, 429 U.S. at 267, 97 S. Ct. at 564).

The Fourth Circuit noted that the legislature utilized various racial data in enacting portions of the law, including the photo identification provisions. *Id*. at 216–18. According to the Fourth Circuit, "relying on this racial data, the General Assembly enacted legislation restricting all—and only—practices disproportionately used by African Americans." *Id*. at 230. The Fourth Circuit determined that "[t]he district court erred in refusing to draw the obvious inference that this sequence of events signals discriminatory intent." *Id*. at 227. The Fourth Circuit concluded that, "at least in part, discriminatory racial intent motivated the enactment of" the 2013 law. *Id*. at 233. Because the plaintiffs carried their burden of establishing discriminatory intent, and because the State had failed to show that the challenged provisions would have been enacted without discriminatory intent, the Fourth Circuit reversed the district court's judgment and remanded the case "for entry of an order enjoining the implementation" of the challenged voting provisions of the 2013 omnibus law. *Id*. at 242.

### 2. *Abbott v. Perez*

Thereafter, the Supreme Court of the United States provided clarification to discriminatory intent analysis that is especially relevant here. In *Abbott*, the Court emphasized that "the 'good faith of [the] legislature must be presumed' " regardless of a prior finding of discriminatory intent. 138 S. Ct. at 2324 (alteration in original) (quoting *Miller v. Johnson*, 515 U.S. 900, 915, 115 S. Ct. 2475, 2488 (1995)). There, the Court reversed the decision of a three-judge panel of the Western District of Texas

because that panel imputed past discriminatory intent to the then-sitting legislature and thereby failed to presume good faith. *Id*. at 2335. The Court stated that:

> The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case. The historical background of a legislative enactment is one evidentiary source relevant to the question of intent. But we have never suggested that past discrimination flips the evidentiary burden on its head.

*Id*. at 2324–25 (cleaned up).

The Court in *Abbott* noted that the lower court "referred repeatedly to the 2013 Legislature's duty to expiate its predecessor's bad intent" and concluded that the "Texas court's references to the need to 'cure' the earlier Legislature's 'taint' cannot be dismissed as stray comments." *Id*. at 2325. Importantly, although the Court stated that "a [trial] court's finding of fact on the question of discriminatory intent is reviewed for clear error," it nonetheless reversed the panel because "when a finding of fact is based on the application of an incorrect burden of proof, the finding cannot stand." *Id*. at 2326.

Thus, the presumption of legislative good faith is only overcome when a plaintiff meets his or her burden of proving that the legislature responsible for enacting the challenged law acted with discriminatory intent in the present case. Past discrimination may be a relevant factor under an *Arlington Heights* analysis,

but it is error to treat subsequent legislative acts as fruit of the poisonous tree such that subsequent similar legislation is per se verboten.[6]

In addition, *Abbott* clearly emphasized that a trial court errs when it makes findings of fact utilizing the incorrect burden of proof, and any findings which result therefrom are not binding on a reviewing court. *See id.* at 2326 (holding that "when a finding of fact is based on the application of an incorrect burden of proof, the finding cannot stand"); *see also State v. Otto*, 366 N.C. 134, 136, 726 S.E.2d 824, 827 (2012) (holding that when "evidence does not support the trial court's finding . . . [that] finding of fact is not binding on this Court").

---

[6] "The world moves, and we must move with it." *State v. Williams*, 146 N.C. 618, 639, 61 S.E. 61, 68 (1908) (Clark, C.J., dissenting). Indeed, many of the historical facts referenced by the trial court and in plaintiffs' brief "hav[e] no logical relation to the present day." *Shelby Cnty. v. Holder*, 570 U.S. 529, 554, 133 S. Ct. 2612, 2629 (2013). The Lieutenant Governor, two members of this Court, and the minority leaders in the North Carolina Senate and the North Carolina House of Representatives are the most recent examples of the significant social progress made in North Carolina.

North Carolina's population has changed dramatically. North Carolina ranked 9th in population growth by percentage between 2021 and 2022; representing the third largest addition to population out of all 50 states. Michael Cline, *North Carolina Population Growth Bouncing Back*, Off. of State Budget & Man., (Dec. 22, 2022), https://www.osbm.nc.gov/blog/2022/12/22/north-carolina-population-growth-bouncing-back. While discrimination based on race is a historical reality, to imply that S.B. 824 is a product or derivative of that history is to imply that the people of North Carolina have failed to change. Such an implication is fundamentally at odds with the modern reality of our State. The imputation of wrongs committed in the distant past to current realities is not only unjust and disingenuous, but it also presents an insurmountable hurdle to future progress.

### 3. *Federal Review of S.B. 824*

The federal corollary to the present appeal is found in *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020). There, the plaintiffs challenged S.B. 824 under the federal Equal Protection Clause, alleging that the law had been enacted with discriminatory intent. *Id.* at 301. The plaintiffs moved to enjoin enforcement of the law, and the district court granted the injunction after concluding that the plaintiffs were likely to succeed on their constitutional claims. *Id.*

On appeal, the Fourth Circuit sharply criticized the district court and reversed "because of the fundamental legal errors that permeate the [district court's] opinion." *Id.* at 310–11. Principal among these fundamental errors was that the district court, contrary to the Supreme Court's explicit holding in *Abbott*, focused on the past finding of discriminatory intent in *McCrory* as evidence of discriminatory intent in the passage of S.B. 824. *Id.* Thus, the district court improperly "considered the General Assembly's discriminatory intent in passing the 2013 Omnibus Law to be effectively dispositive of its intent in passing the 2018 Voter-ID Law." *Id.* at 303. The Fourth Circuit stated:

> [t]he district court here made the same mistake as the panel in *Abbott* without even trying to distinguish the Supreme Court's holding. . . . [T]he district court noted that the General Assembly did not try to cleanse the discriminatory taint, or tak[e] steps to purge the taint of discriminatory intent. . . .
>
> The district court penalized the General Assembly because of who they were, instead of what they did. When discussing the sequence of events leading to the 2018

Voter-ID Law's enactment, the district court discounted the normalcy of the legislative process to focus on *who* drafted and passed the law.

*Id.* at 304 (cleaned up).

The Fourth Circuit explicitly disavowed the district court's inappropriate focus on *who* passed S.B. 824:

The question of *who* reared its head again in the court's discussion of the 2018 Voter-ID Law's legislative history. In that section, the district court emphasized that the General Assembly's positions had "remained virtually unchanged" between *McCrory* and the enactment of the 2018 Voter-ID law. And the court assumed that the racial data remained in the minds of the legislators: "[T]hey need not have had racial data in hand to still have it in mind." By focusing on *who* passed the 2018 Voter-ID Law and requiring the General Assembly to purge the taint of the prior law, the district court flipped the burden and disregarded *Abbott*'s presumption.

*Id.* at 304–05 (alteration in original) (quoting *NAACP v. Cooper*, 430 F. Supp. 3d at 33–35).

The district court's analytical reliance on *who* passed S.B. 824 "also overlooked the state constitutional amendment" by which "[f]ifty-five percent of North Carolinian voters constitutionally required the enactment of a voter-ID law and designated to the General Assembly the task of enacting the law." *Id.* at 305 (citing N.C. Const. art. VI, § 2(4)). Because the amendment "served as an independent intervening event between the General Assembly's passage of the 2013 Omnibus Law and its enactment of the 2018 Voter-ID Law," Article VI, Section 2(4) of the North Carolina Constitution "undercut[ ] the district court's tenuous 'who' argument." *Id.*

-29-

The Fourth Circuit determined that "[o]nce the proper burden and the presumption of good faith are applied, the Challengers fail to meet their burden of showing that the General Assembly acted with discriminatory intent in passing the 2018 Voter-ID Law." *Id.* In reaching this conclusion, the Fourth Circuit clarified that although "North Carolina's historical background," including the 2013 omnibus law, "favors finding discriminatory intent, the facts considered under the remaining *Arlington Heights* factors—the sequence of events leading to enactment, legislative history, and disparate impact—cannot support finding discriminatory intent." *Id.* (cleaned up).

First, the Fourth Circuit analyzed "the sequence of events leading to the enactment of the 2018 Voter-ID Law." *Id.* Noting that S.B. 824 "underwent five days of legislative debate," "was permitted time for public comment," and "enjoyed bipartisan support," the Fourth Circuit determined that "the enactment was not the 'abrupt' or 'hurried' process that characterized the passage of the 2013 Omnibus Law." *Id.* at 305–06 (citing *McCrory*, 831 F.3d at 228–29).

Next, the Fourth Circuit analyzed "the 2018 Voter-ID Law's legislative history," which the district court found "supported finding discriminatory intent" because "Republican legislative leaders strongly opposed *McCrory*, remained committed to passing a voter-ID law that would withstand future court challenges, and did not change their positions, goals, or motivations between the passage of the 2013 Omnibus Law and the 2018 Voter-ID Law." *Id.* at 307. The Fourth Circuit

specifically denounced the district court's reasoning because its findings "impermissibly stemmed from the comments of a few individual legislators and relied too heavily on comments made by the bill's opponents." *Id.* (cleaned up).

The Fourth Circuit also stated that the district court's reasoning "go[es] against inferring 'good faith' on the part of the legislature, which we are required to do: decrying a court opinion holding that you acted improperly in the past is not evidence that you have acted improperly again." *Id.* Noting that "[n]othing here suggests that the General Assembly used racial voting data to disproportionately target minority voters 'with surgical precision,' " the Fourth Circuit concluded that S.B. 824's legislative history did not evidence discriminatory intent. *Id.* at 308–09 (quoting *McCrory*, 831 F.3d at 214).

Finally, the Fourth Circuit analyzed "the racial impact of the 2018 Voter-ID Law." *Id.* at 309. While the Fourth Circuit "accept[ed] the district court's finding that minority voters disproportionately lack the types of ID required" by S.B. 824, it found significant that the law "contains three provisions that go 'out of [their] way to make its impact as burden-free as possible.' " *Id.* (second alteration in original) (quoting *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 603 (4th Cir. 2016)).

> First, the law provides for registered voters to receive free voter-ID cards without the need for corroborating documentation. Second, registered voters who arrive to the polls without a qualifying ID may fill out a provisional ballot and their votes will be counted if they later produce a qualifying ID at the county elections board. Third, people with religious objections, survivors of recent natural disasters, and those with reasonable impediments may

-31-

> cast a provisional ballot after completing an affidavit that affirms their identity and their reason for not producing an ID. Their votes must be counted unless the county board of elections has grounds to believe the affidavit is false.

*Id.* (cleaned up).

The Fourth Circuit noted that, because of these various mitigating provisions, "the 2018 Voter-ID law is more protective of the right to vote than other states' voter-ID laws that courts have approved." *Id.* at 310.

> In *Lee v. Virginia State Board of Elections*, we upheld Virginia's voter-ID law that only included two of these mitigating features—free voter IDs available without corroborating documentation and provisional voting subjected to 'cure.' Likewise, in *South Carolina v. United States*, the District Court of the District of Columbia precleared South Carolina's voter-ID law that included a different combination of two mitigating features—free voter IDs available without corroborating documentation and a reasonable impediment procedure. And recently, the Eleventh Circuit, in *Greater Birmingham Ministries v. Secretary of State for the State of Alabama*, upheld Alabama's Voter-ID law that included . . . mitigating features—free voter IDs that require corroborating documentation and provisional voting subject to 'cure.' Given these cases, it is hard to say that the 2018 Voter-ID Law does not sufficiently go out of its way to make its impact as burden-free as possible.

*Id.* (cleaned up).

Because of these mitigating provisions, the Fourth Circuit determined that any potential disparate impact of S.B. 824 did not evidence any discriminatory intent by the General Assembly. *Id.* The Fourth Circuit reversed the district court, but not because "[the district court] weighed the evidence before it differently than [the

Fourth Circuit] would." *Id.* Rather, the Fourth Circuit reversed the district court's grant of a preliminary injunction "because of the fundamental legal errors that permeate the opinion—the flipping of the burden of proof and the failure to provide the presumption of legislative good faith—that irrevocably affected its outcome." *Id.* at 310–11. The district court "abused its discretion" because "it considered the North Carolina General Assembly's past conduct to bear so heavily on its later acts that it was virtually impossible for it to pass a voter-ID law that meets constitutional muster." *Id.* at 311.

## E. Review of the Panel Below

### 1. Under the Federal Framework

Although *Raymond* was decided under the federal Equal Protection Clause, we are confronted in the present appeal with a similar question under the North Carolina Constitution. When properly analyzed under *Arlington Heights*, plaintiffs' claim here, as in *Raymond*, must fail because the same fundamental legal errors that permeated the district court's decision in *Raymond* pervade the trial court's order below.

A majority of the three-judge panel below made findings of fact based upon historical evidence that, while perhaps useful in a policy setting, has little bearing upon the constitutionality of S.B. 824 in light of *Abbott*. As the dissent below noted, to "place outsized weight on the increasingly distant past would constitute a failure by the judiciary to allow our [s]tate to fully progress from that shameful past. Any

overreliance on our [s]tate's history is therefore misplaced." The trial court's findings demonstrate exactly this sort of overreliance on historical evidence, and these findings "were not merely 'stray comments. On the contrary, they were central to the court's analysis,' for they made explicit the burden-shifting that the court engaged in while assessing the *Arlington Heights* factors." *Raymond*, 981 F.3d at 304 (quoting *Abbott*, 138 S. Ct. at 2325).

The trial court's finding that "recent cases," including *McCrory*, "show that race is still a dominant consideration for the North Carolina General Assembly" is illustrative. As the Supreme Court of the United States has made abundantly clear, "[t]he allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Abbott*, 138 S. Ct. at 2324. "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* (cleaned up). The trial court's attribution of past sins to the passage of S.B. 824 is plainly contrary to *Abbott*.

In addition, the trial court's finding that "[j]ust as with other states in the South, North Carolina has a long history of race discrimination generally and race-based voter suppression in particular," was a quotation of a Court of Appeals' quotation from *McCrory*, not a finding premised upon any evidence in this particular case. *See Holmes v. Moore*, 270 N.C. App. 7, 20–21, 840 S.E.2d 242, 257 (2020); *McCrory*, 831 F.3d at 223. Again, the trial court's use of historical information to strike down an otherwise lawful act is exactly what *Abbott* cautioned against.

Further, the trial court made specific findings of fact regarding statements made in the wake of *McCrory*, evidently considering that statements criticizing that decision and vowing to "continue the fight" for a voter identification law supported a finding that S.B. 824 was enacted with discriminatory intent. Once again, this finding is contrary to directly on-point federal precedent. In *Raymond*, "the district court noted that Republican legislative leaders strongly opposed *McCrory*, [and] remained committed to passing a voter-ID law that would withstand future court challenges." *Raymond*, 981 F.3d at 307. The Fourth Circuit refused to sanction these findings because they "[went] against inferring 'good faith' on the part of the legislature, which we are required to do: decrying a court opinion holding that you acted improperly in the past is not evidence that you have acted improperly again." *Id*. (citing *Abbott*, 138 S. Ct. at 2324, 2327).

Also, the trial court found that both the passage of the constitutional amendment which required enactment of S.B. 824 and the enactment of S.B. 824 itself departed from normal legislative procedures, and the trial court evidently relied on this finding when determining that "[t]he [l]egislative [h]istory of S.B. 824 [r]aises [a]dditional [r]ed [f]lags." The trial court "found" that "[t]here is no reason why the General Assembly could not have followed normal procedures, passed implementing legislation to accompany the proposed constitutional amendment, and submitted that proposed legislation to the People of North Carolina for their approval." The trial court's findings on this issue, however, are contrary to both federal precedent, North

Carolina precedent, and the historical role of the judiciary in not second-guessing the contours of the legislative process.

The Supreme Court of the United States has stated "we do not see how the brevity of the legislative process can give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith." *Abbott*, 128 S. Ct. at 2328–29. This Court has stated "the role of the Court is not to sit as a super legislature and second-guess the balance struck by the elected officials." *Bryant*, 359 N.C. at 565, 614 S.E.2d at 485 (quoting *Harvey*, 315 N.C. at 491, 340 S.E.2d at 731). Moreover, and perhaps most importantly, the North Carolina Constitution contains an explicit separation of powers provision, *see* N.C. Const. art. I, § 6, which is violated "when one branch exercises power that the constitution vests exclusively in another branch" or "when the actions of one branch prevent another branch from performing its constitutional duties." *State v. Berger*, 368 N.C. 633, 645, 781 S.E.2d 248, 256 (2016).

There is no law in this state that implies the General Assembly possesses anything less than its full constitutional authority when conducting legislative business in a special session. Despite this, the trial court's order indicates that the panel below sees itself as possessing the power to second-guess the legislature's authority over its own procedures, thereby "prevent[ing] another branch from performing its constitutional dut[y]." *Id.* It bears repeating that "[t]o interpret, expound, or declare what the law is, or has been, and to adjudicate the rights of

litigants, are judicial powers; to say what the law shall be is legislative." *Revis*, 193 N.C. 192, 136 S.E. at 347.

One of the many governmental functions the constitution vests exclusively in the legislature is the balancing of policy interests involved when drafting, amending, and enacting laws. During this process for S.B. 824, the General Assembly accepted amendments proposed by Democrat members, and multiple Democrat members thanked and praised their Republican colleagues for the bipartisan and collaborative manner in which the law was passed. Democrats thanked the Republican members "for being open and inclu[sive] in listening to us on the other side of the aisle in trying to come up with something that is reasonable," "for the hard work that you have done in negotiating and accepting many of the amendments that have been placed before you," and for doing "a really terrific job working with us to help improve the bill, [which] is a much better bill than the bill that left this chamber in 2013."[7]

---

[7] "One might question the relevance of bipartisanship in a discriminatory-intent analysis," *Raymond*, 981 F.3d at 306, n.3, because "partisan motives are not the same as racial motives." *Brnovich*, 141 S. Ct. at 2349. This is why, even under *Arlington Heights*, a court is required to "assess whether the plaintiffs have managed to disentangle race from politics and prove that the former drove" a law's enactment. *Cooper v. Harris*, 581 U.S. 285, 308, 137 S. Ct. 1455, 1473 (2017) (citation omitted). Under our standard, this means that plaintiffs must prove beyond a reasonable doubt that racial, rather than political, considerations motivated the passage of a law they claim was enacted with discriminatory intent. For plaintiffs here, that requirement is at odds with their theory of the case, which inextricably "[ ]entangle[s] race [and] politics[.]" *Id.* Article I, Section 19 prohibits discrimination based on race; political parties are not protected classes, and barring proof that racial animus, rather than political considerations, led to the passage of a particular measure, we find it difficult to imagine a scenario in which partisan interests would constitute sufficient evidence that a law was enacted with discriminatory intent.

Despite this, the trial court went on to enter speculative findings of fact regarding additional measures the legislature could have taken, such as adopting more of the amendments proposed by Democrat members of both chambers. According to the trial court, the legislature's failure to take these additional steps, despite the obviously bipartisan nature of the law's enactment, led to the trial court's finding of fact heading that "The Design of S.B. 824 Does Not Evince an Intent by the General Assembly to Cure Racial Disparities Observed Under H.B. 589."

Under this heading, the trial court found "that [d]efendants have not rebutted [p]laintiffs' assertion that the General Assembly did not consider any updated racial demographic data prior to the enactment of S.B. 824." Moreover, the trial court found that "[t]he categories of ID added to the list of acceptable ID were arbitrary, and [l]egislative [d]efendants have offered no evidence to show that inclusion of these ID[s] would make a difference to overcome the already existing deficiency." Presumably, this "already existing deficiency" was the prior outcome in *McCrory*, which clearly demonstrates that the General Assembly was not afforded the presumption of legislative good faith, rather, its decisions were criticized by the lower court for "demonstrating . . . lack of reasoning or logic."

Putting aside for a moment the glaringly obvious conflict with *Raymond* and *Abbott*, this heading itself indicates that the trial court fundamentally misunderstood the applicable legal framework, plaintiffs' burden, and its own task. Even presuming the findings underpinning this heading are supported by competent evidence, they at

most support a conclusion that the legislature failed to do everything possible to ameliorate any alleged disparate impact. They do not support a conclusion that the legislature acted with discriminatory intent and actively designed a bill to cause the alleged disparate impact.

That reasonable minds may differ as to whether the legislature endeavored to pass the least restrictive voter identification law possible does not equate to a showing that the legislature endeavored to pass a voter identification law designed to disparately impact black North Carolinians. Plaintiffs' burden is not to demonstrate beyond a reasonable doubt that a hypothetical alternative law may have been less restrictive; it is to demonstrate beyond a reasonable doubt that *this* law was designed to discriminate on the basis of race. The evidence in the record cannot support such a contention because the hypothetical existence of a less restrictive alternative does not satisfy plaintiffs' burden. If that were so, no law could ever stand.

Hereto, the trial court's findings directly conflict with precedent of the Supreme Court of the United States which could not be clearer:

> The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. *Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.* The ultimate question remains whether a discriminatory intent has been proved in a given case. The historical background of a legislative enactment is one evidentiary source relevant to the question of intent. *But we have never suggested that past discrimination flips the evidentiary burden on its head.*

*Abbott*, 138 S. Ct. at 2324–25 (cleaned up) (emphases added).

The panel below "made the same mistake as the panel in *Abbott* without even trying to distinguish the Supreme Court's holding." *Raymond*, 981 F.3d at 304. The trial court inexplicably ignored *Abbott* and *Raymond*, and this serious and egregious error undermines the integrity of the trial court's decision and its decision-making process. The improper reliance on speculative historical evidence and failure to analyze *Abbott* made it "virtually impossible for [the legislature] to pass a voter-ID law that meets constitutional muster." *Id.* at 311.

"When evaluating a neutral, nondiscriminatory regulation of voting procedure, we must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 203, 128 S. Ct. 1610, 1623 (2008) (cleaned up). It is not the role of this Court to endorse an analytical approach that would effectively enjoin all future legislatures from effectuating the will of the people. This is why *Abbott* and *Raymond* are so critical to a proper analysis.

As the Supreme Court of the United States has noted, "a finding of fact . . . based on the application of an incorrect burden of proof . . . cannot stand." *Abbott*, 138 S. Ct. at 2326. Here, the trial court's findings of fact flow from impermissibly assigning the burden to the General Assembly and failing to presume legislative good faith.

The trial court's order is riddled with both explicit and implicit instances demonstrating that, as here, it erroneously placed the burden on the General Assembly to overcome a presumption of legislative bad faith. As in *Abbott*, these findings cannot stand, and the trial court's legal conclusions are left unsupported. Thus, the "fundamental legal errors that permeate the [lower panel's opinion]—the flipping of the burden of proof and the failure to provide the presumption of legislative good faith" have "irrevocably affected [the] outcome [of this case]," *Raymond*, 981 F.3d at 310–11, and we hold that even under *Arlington Heights*, the trial court's finding of discriminatory intent was erroneous.

### 2. *Under North Carolina Law*

However, as previously noted, *Arlington Heights* is not the standard plaintiffs challenging a presumptively valid legislative act are required to meet in this state. *See Strudwick*, 379 N.C. at 105, 864 S.E.2d at 240 ("[W]e will not declare a law invalid unless we determine that it is unconstitutional beyond a reasonable doubt." (quoting *Grady*, 372 N.C. at 522, 831 S.E.2d at 553)). Where a trial court applies the incorrect legal standard, regardless of whether the parties consent to that incorrect standard, the trial court per se abuses its discretion. *See Da Silva v. WakeMed*, 375 N.C. 1, 5 n.2, 846 S.E.2d 634, 638 n.2 (2020) ("[A]n error of law is an abuse of discretion.").

In addition, just as the Supreme Court of the United States has held that "a finding of fact . . . based on the application of an incorrect burden of proof . . . cannot stand," *Abbott*, 138 S. Ct. at 2326, this Court has held that "facts found under

misapprehension of the law are not binding on this Court and will be set aside." *Van Hanford v. McSwain*, 230 N.C. 229, 233, 53 S.E.2d 84, 87 (1949). Because the trial court's findings of fact below were found under a misapprehension of law, i.e., under the incorrect legal standard, without requiring plaintiffs to carry their burden of demonstrating the unconstitutionality of S.B. 824 beyond a reasonable doubt, these findings cannot stand. Without them, the trial court's conclusions of law are wholly unsupported and the order below must be reversed.

The general procedure for disposing of a matter where the trial court's "facts found under misapprehension of the law are . . . set aside," would be to remand the case "to the end that the evidence should be considered in its true legal light." *Id.* However, such a procedure is inappropriate in matters such as this, where the evidence in the record is wholly insufficient to prove beyond a reasonable doubt that S.B. 824: (1) was enacted with discriminatory intent, and (2) produces a meaningful disparate impact. *See Snuggs v. Stanly Cnty. Dep't of Pub. Health*, 310 N.C. 739, 741, 314 S.E.2d 528, 529 (1984) (remanding to the trial court for entry of an order of dismissal); *Hunt ex rel. Hasty v. N.C. Dep't of Lab.*, 348 N.C. 192, 199, 499 S.E.2d 747, 751 (1998) (same). Here, plaintiffs have produced insufficient evidence to meet their burden.

To succeed in their claim, plaintiffs must demonstrate not only discriminatory intent, but must also demonstrate that the challenged law actually "produces disproportionate effects along racial lines." *Hunter*, 471 U.S. at 227, 105 S. Ct. at

1920; *see also Irby v. Va. State Bd. of Elections*, 889 F.2d 1352, 1355 (4th Cir. 1989) ("To establish an equal protection violation, a plaintiff must show discriminatory intent *as well as* disparate effect." (emphasis added)). On this point, plaintiffs' evidence consists of incompetent expert testimony and unfounded speculation upon which the trial court found that "S.B. 824 would bear more heavily on African American voters, if permitted to go into effect" because: (1) black voters are more likely to lack qualifying ID; (2) the burdens of obtaining qualifying IDs, including free IDs, fall more heavily on black voters; and (3) black voters may be more likely to encounter problems navigating the reasonable impediment process.

Regarding the disparate lack of qualifying identifications, plaintiffs' expert failed to consider multiple types of qualifying identifications, the reasonable impediment provision, and the availability of free identifications under S.B. 824. Plaintiffs' expert simply produced a mathematical analysis based on DMV records that showed 7.61% of black voters and 5.47% of white voters lacked *some* of the qualifying IDs under S.B. 824. Such an incomplete consideration of the various forms of qualifying identification under S.B. 824 renders this expert's evidence fatally deficient and incapable of supporting a finding that black voters are more likely to lack the qualifying identifications permitted under S.B. 824.

Furthermore, the trial court's finding that black voters are "39% more likely to lack a form of qualifying ID" than white voters is exactly the kind of "highly misleading" statistical transformation the Supreme Court of the United States has

expressly disavowed. *Brnovich*, 141 S. Ct. at 2345. This kind of manipulation of mathematical concepts is used to turn a difference "small in absolute terms," here, 2.14%, into "a distorted picture . . . by dividing one percentage by another," *id*. at 2344–45, and such evidence is insufficient to support a finding that black voters are more likely to lack qualifying identification under S.B. 824.

Similarly, plaintiffs' evidence that the burdens of obtaining qualifying identification, including free identification, fall more heavily on black voters is entirely speculative. Plaintiffs' expert essentially suggests that because "a [b]lack person is 2.5 times more likely to live in poverty as compared to a white person," it must logically follow that black voters would disproportionately suffer a legally significant burden in obtaining a qualifying identification, even if that identification is free. This is merely speculative forecasting and simply ignores the reality that compliance with *any* government licensing or registration requirement requires effort on the part of citizens. "[M]inor inconvenience[s] . . . do[ ] not impose a substantial burden." *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 600 (4th Cir. 2016). Plaintiffs cannot prove such a crucial aspect of their claim by relying on speculation; they must provide sufficient evidence demonstrating that S.B. 824 actually produces disparate impact in reality, not hypothetical circumstances.[8]

---

[8] Further, the panel's assumption that black voters may have difficulty acquiring free identification due to lack of transportation or disabilities is legally suspect because the reasonable impediment provision in S.B. 824 allows individuals to vote without an identification if their inability to obtain an identification is due to, among other things, a "[l]ack of transportation" or "[d]isability or illness." N.C.G.S. § 163.166.16(e)(1)(a)–(b).

The trial court's finding that black voters may be more likely to encounter problems navigating the reasonable impediment process suffers from the same fatal flaw that plagues the previous examples. The trial court merely relied on plaintiffs' evidence of past voters' issues navigating a more restrictive reasonable impediment process in 2016 under H.B. 589 and testimony that "[a] hesitant or infrequent voter *may be* deterred from voting with a reasonable impediment declaration because the process is unfamiliar or because it appears the voter is being treated differently from everyone else at the polls." (Emphasis added). This again is speculation that falls short of the evidence required to support this factual finding.

Thus, because plaintiffs have failed to provide evidence that S.B. 824 would result in disparate impact along racial lines, remand of this case for further consideration in light of the applicable legal standard, presumption, and burden, would be futile. S.B. 824 allows *all* would-be voters in North Carolina to vote either with or without an approved form of identification. Plaintiffs failed to produce sufficient evidence that either they, or any other citizen of this state, would be precluded from voting due to the terms and conditions of S.B. 824. Every prospective voter can vote without an identification if they submit a reasonable impediment affidavit, which can only be rejected if the county board of elections unanimously determines that the declaration is false.[9]

---

[9] The dissent below correctly stated that "[a]s the federal court three-judge panel said of South Carolina's voter-ID law, on which S.B. 824 was modeled, 'the sweeping reasonable impediment provision in [that law]'—which, as noted, is in fact less sweeping tha[n] S.B.

As stated by the Supreme Court of the United States when reviewing Indiana's

voter identification law,

> A photo identification requirement imposes some burdens on voters that other methods of identification do not share. For example, a voter may lose his photo identification, may have his wallet stolen on the way to the polls, or may not resemble the photo in the identification because he recently grew a beard. Burdens of that sort arising from life's vagaries, however, are neither so serious nor so frequent as to raise any question about the constitutionality of [Indiana's voter identification law]; the availability of the right to cast a provisional ballot provides an adequate remedy for problems of that character.
>
> The burdens that are relevant to the issue before us are those imposed on persons who are eligible to vote but do not possess a current photo identification that complies with the requirements of [Indiana's voter identification law]. . . . But just as other States provide free voter registration cards, the photo identification cards issued by Indiana[ ]are also free. For most voters who need them, the inconvenience of making a trip to [a government office], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting.

*Crawford*, 553 U.S. at 197–98, 128 S. Ct. at 1620–21.[10]

---

824's—'eliminates any disproportionate effect or material burden that South Carolina's voter ID law otherwise might have caused.' " (quoting *South Carolina v. United States*, 898 F. Supp. 2d 30, 40 (D.D.C. 2012).

[10] It is undisputed that every legal vote should be counted. In oral argument, however, plaintiffs implied that every provisional ballot should be counted as legal even if not lawfully cast. Oral Argument at 55:01, Holmes v. Moore (No. 342PA19-3) (Mar. 15, 2023), https://www.youtube.com/watch?v=RSJu29af7_4 (last visited Mar. 24, 2023). The trial court's order contains a similar proposition under the guise of a factual finding regarding noncompliant votes in 2016. This is plainly wrong. *See* N.C.G.S. §§ 163-1 to 163-306 (2021); *see also Burdick*, 504 U.S. at 441, 112 S. Ct. at 2067 (citation omitted) ("[T]he right to vote is

"[M]inor inconvenience[s] . . . do[ ] not impose a substantial burden" on the right to vote, *Lee*, 843 F.3d at 600, and the inconveniences theoretically imposed, not proven, on plaintiffs by S.B. 824 "arise[ ] from life's vagaries" and "are neither so serious nor so frequent as to raise any question about the constitutionality" of the voter identification law here. *Crawford*, 553 U.S. at 197, 128 S. Ct. at 1620. In no way do the hypothetical "<u>disparate inconveniences</u>" claimed by plaintiffs amount to a "<u>denial or abridgement of the right to vote</u>," let alone a denial or abridgment based on race. *Lee*, 843 F.3d at 600–01 (emphasis in original). Arguably, plaintiffs' speculations do not qualify as a legitimate attempt to carry their burden of "establish[ing] that no set of circumstances exists under which the [a]ct would be valid." *Salerno*, 481 U.S. at 745, 107 S. Ct. at 2100.

The panel below relied heavily on the fact that plaintiff Mr. Holmes, who has cerebral palsy, has severe scoliosis, and is paraplegic, may encounter difficulties in obtaining a free identification under S.B. 824. Even if we ignore the fact that Mr. Holmes can still vote without an identification under S.B. 824, as discussed above,

---

the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system."); *Storer v. Brown*, 415 U.S. 724, 730, 94 S. Ct. 1274, 1279 (1974) ("Moreover, as a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."). The right to vote and have a vote counted is dependent upon compliance with established rules and procedures, and to suggest this Court sanction noncompliance is to imply that the law has no meaning.

any difficulties he may face in acquiring an identification have nothing to do with race.

Such is the case with the other plaintiffs and their challenges. There is no evidence that Mr. Kearney's failure to present an identification in 2016 because he left it at home was related to race. Similarly, Mr. Smith's misplacement of his identification in 2016 was not related to race, nor was Mr. Culp's failure to present an acceptable identification in 2016. Setting aside the fact that any difficulties they are assumed to have encountered are wholly irrelevant because they occurred under a prior, much more restrictive law, these difficulties were not attributable to race, and all of these plaintiffs can vote under S.B. 824 without identification.

Moreover, the named plaintiffs can all obtain free identification cards that can be used for eleven years and, even if they fail to do so, can cast provisional ballots that will be counted if they comply with the forgiving requirements of S.B. 824. As the dissenting judge noted below, "[t]here is no credible evidence that obtaining" a form of qualifying identification under S.B. 824 "entails significant financial cost." The record also contains "no evidence that any voter, in particular any African American voter, would be dissuaded from using" the reasonable impediment declaration process if they failed to obtain a qualifying identification.

In sum, for all the aforementioned reasons, plaintiffs have failed to provide evidence sufficient to prove beyond a reasonable doubt that S.B. 824 will result in disparate impact. Because "plaintiff[s] must show discriminatory intent as well as

disparate effect," *Irby*, 899 F.2d at 1355, to prevail, plaintiffs' failure to provide sufficient evidence of disparate impact ends the matter. Nevertheless, we note that plaintiffs also fail to provide sufficient evidence of discriminatory intent.

First, plaintiffs failed to produce any witness who could testify to the General Assembly's alleged discriminatory intent or otherwise rebut the presumption of good faith. Representative Harrison, plaintiffs' own witness, testified that she "cannot say that racial bias entered into [passage of S.B. 824] and [she] would not say that racial bias entered into [passage of S.B. 824]." As aptly put by the dissenting judge below, "[i]f [p]laintiffs' own witness, who was in the General Assembly and actively participated in the passage of this legislation, did not then and does not now attribute the passage of S.B. 824 [to] any discriminatory intent, then this [c]ourt certainly [should] not either."

Further, the evidence that S.B. 824 was passed in a special legislative session, did not receive overwhelming support from Democratic legislators, and was enacted without the consideration of racial data, is wholly insufficient to demonstrate discriminatory intent beyond a reasonable doubt. Because our constitution commands that "[t]he role of the legislature is to balance the weight to be afforded to disparate interests and to forge a workable compromise among those interests," it is not the role of this Court "to sit as a super legislature and second-guess the balance struck by the elected officials." *Bryant*, 359 N.C. at 565, 614 S.E.2d at 486 (alteration in original) (quoting *Harvey*, 315 N.C. at 491, 340 S.E.2d at 731). As the dissent below

correctly noted, the General Assembly's decision to comply with the people's command to pass a voter identification law by enacting such a law in a special session in order to override the veto of Governor Cooper, a vocal opponent of *any* such law, "was completely lawful and within [its] authority."

Finally, there are two further fundamental errors below worthy of brief discussion. First, the panel's factual findings regarding both the sequence of events leading to the enactment of S.B. 824 and the legislative history of S.B. 824 misapprehend the relevant presumptions in favor of the law's validity because they fail to properly consider and credit the crucial importance of the voter identification amendment. Because the constitutional amendment created a positive duty for the General Assembly to pass a voter identification law, adoption of S.B. 824 or some similar measure was mandatory, not optional. The evidence, viewed with the proper presumptions of both legislative good faith and constitutional compliance, plainly demonstrates an intent to comply with the peoples' will and the North Carolina Constitution, not an intent to discriminate on the basis of race.

Second, the panel appears to have given considerable weight to the fact that the General Assembly requested racial data when enacting H.B. 589 but did not request racial data when enacting S.B. 824. It bears repeating that the request of racial data, and the use of that data, was one of the primary reasons the Fourth Circuit held that H.B. 589 was enacted with discriminatory intent. *See McCrory*, 831 F.3d at 230; *see also Raymond*, 981 F.3d at 308–09 ("The 2018 Voter-ID Law's

legislative history is otherwise unremarkable. Nothing here suggests that the General Assembly used racial voting data to disproportionately target minority voters 'with surgical precision.' " (quoting *McCrory*, 831 F.3d at 214)).

According to the trial court, because the General Assembly did not request this data, "the legislature did not know whether these changes between S.B. 824 and H.B. 589 would have any impact on the racial disparities in ID possession rates that had been documented during the H.B. 589 litigation." Paradoxically, the trial court nevertheless implied, in the absence of any evidence, that the "62 members of the legislature who voted for H.B. 589 [and] also voted for S.B. 824" relied on the H.B. 589 data when enacting S.B. 824, stating that it was "implausible that these legislators did not understand the potential that S.B. 824 would disproportionately impact [black] voters, just as H.B. 589 had done."

Thus, in the absence of any evidence that any legislator utilized racial data from *McCrory*, and in direct contradiction of the testimony from Representative Harrison, the trial court imputed knowledge to 62 members of the General Assembly and presumed bad faith of an entire branch of our government. The General Assembly was placed in a "damned if you do, damned if you don't" conundrum in which, had it used racial data, it would run afoul of the prior admonition in *McCrory*, and by not using such data, it could never satisfy the trial court's application of the *Arlington Heights* test. There was, thus, no option available to the legislature that could lead to implementation of a voter identification measure. This is exactly the

kind of reasoning explicitly disavowed by the Supreme Court of the United States and the Fourth Circuit. As stated by the Fourth Circuit:

> [T]he [trial] court emphasized that the General Assembly's positions had "remained virtually unchanged" between *McCrory* and the enactment of the 2018 Voter-ID Law. And the court assumed that the racial data remained in the minds of the legislators: "[T]hey need not have had the racial data in hand to still have it in mind." By focusing on *who* passed the 2018 Voter-ID Law and requiring the General Assembly to purge the taint of the prior law, the district court flipped the burden and disregarded *Abbott*'s presumption.

*Raymond*, 981 F.3d at 304–05 (third alteration in original); *see also Abbott*, 138 S. Ct. at 2324 ("[T]he good faith of the state legislature must be presumed. The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." (cleaned up)).

When this matter is considered under the applicable legal standards, plaintiffs can neither carry their burden of demonstrating discriminatory intent beyond a reasonable doubt nor their burden of demonstrating meaningful disparate impact beyond a reasonable doubt. Therefore, the order below is reversed and we remand to the trial court for entry of a dismissal in this matter.

## IV. Conclusion

"A frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." N.C. Const. art. I, § 35. This humble reminder applies not just to individual rights preserved by our Constitution, but to the

fundamental structure of our government, without which rights cannot properly be protected.

In North Carolina "[t]he legislature is the great and chief department of government. It alone is created to express the will of the people." *Wilson v. Jordan*, 124 N.C. 683, 701, 33 S.E. 139, 150 (1899) (Clark, J., dissenting). Indeed, "for the courts to strike down valid acts of the [l]egislature would be wholly repugnant to, and at variance with, the genius of our institutions." *Revis*, 193 N.C. at 196, 136 S.E. at 348.

The people of North Carolina overwhelmingly support voter identification and other efforts to promote greater integrity and confidence in our elections. Subjective tests and judicial sleight of hand have systematically thwarted the will of the people and the intent of the legislature. But no court exists for the vindication of political interests, and judges exceed constitutional boundaries when they act as a super-legislature. This Court has traditionally stood against the waves of partisan rulings in favor of the fundamental principle of equality under the law. We recommit to that fundamental principle and begin the process of returning the judiciary to its rightful place as "the least dangerous" branch. The Federalist No. 78 at 402 (Alexander Hamilton) (Gideon ed. 2001).

Plaintiffs here have failed to prove beyond a reasonable doubt that S.B. 824 was enacted with discriminatory intent or that the law actually produces a meaningful disparate impact along racial lines. The prior opinion is withdrawn, and

we reverse and remand to the trial court for entry of an order dismissing plaintiffs' claim with prejudice.

REVERSED AND REMANDED.

Justice MORGAN dissenting.

Not long ago, the current Chief Justice of this Court, who is the most senior member of the majority in the present case, observed in a dissenting opinion:

> Judicial activism is a philosophy of judicial decision-making whereby judges allow their personal views about public policy, among other factors, to guide their decisions, usually with the suggestion that adherents of this philosophy tend to find constitutional violations and are willing to ignore governing texts and precedents. It is difficult to imagine a more appropriate description of the action that the majority takes today.

*State v. Kelliher*, 381 N.C. 558, 597 (2022) (Newby, C.J., dissenting) (extraneity omitted). Consistent with this swashbuckling view, the Chief Justice also wrote this richly ironic nugget a few years back as a dissenter in one of this Court's opinions:

> As a monarch, King Louis XVI once famously said, *"C'est légal, parce que je le veux"* ("It is legal because it is my will.") Today, four justices of this Court adopt the same approach to the law, violating the norms of appellate review and disregarding or distorting precedent as necessary to reach their desired result. Apparently, in their view, the law is whatever they say it is. . . .
>
> . . . .
>
> . . . Instead of doing the legally correct thing, the majority opinion picks its preferred destination and reshapes the law to get there.

*State v. Robinson*, 375 N.C. 173, 193, 195 (2020) (Newby, J., dissenting) (footnote omitted).

In uniform fashion, the author of the majority opinion in this case[1] recently

offered this dissenting view in one of this Court's decisions:

> The majority's dismissal of our precedent here is deeply
> troublesome, yet increasingly unsurprising. . . .
>
> . . . .
>
> That the majority has injected chaos and confusion
> into our political structure is self-evident.

*N.C. State Conf. of the NAACP v. Moore*, 382 N.C. 129, 182, 197 (2022) (Berger, J.,

dissenting).

Similarly, yet a third member of the majority in the instant case freshly penned

this dissenting observation in response to an order of this Court a short time back:

> [T]he majority's decision today appears to reflect deeper
> partisan biases that have no place in a judiciary dedicated
> to the impartial administration of justice and the rule of
> law.

*Harper v. Hall*, 382 N.C. 314, 317 (2022) (order allowing expedited hearing and

consideration) (Barringer, J., dissenting).

It is apparent from the artfully chosen words of my three distinguished

colleagues that they have not been reticent about the notion of introducing partisan

politics into this Court's opinions when they disagreed with various case outcomes.

Indeed, these three justices of the majority have clearly been enamored with this

---

[1] For clarity, the authoring justice of the majority opinion and the identity of one of
the named defendants are not one and the same. Although the two individuals have identical
first and last names, the named defendant is the father of the authoring justice.

strategic approach which has been conveniently conceived in order to cast aspersions in certain categories of cases which this Court decided in a manner which differed from their three united orientations. Yet now, joined by two more justices who subscribe to the trio's identical politically saturated legal philosophies and who were elected to serve on the Court since the dissenting opinions cited above were written, the five justices which constitute the majority here have emboldened themselves to infuse partisan politics brazenly into the outcome of the present case. This majority's extraordinarily rare allowance of a petition for rehearing in this case, mere weeks after this newly minted majority was positioned on this Court and mere months after this case was already decided by a previous composition of members of this Court, spoke volumes. My consternation with the majority's abrupt departure from this Court's institutionalized stature—historically grounded in this forum's own reverence for its caselaw precedent, its deference to the rule of law, and its severance from partisan politics—is colossal. When convenient at the time, Chief Justice Newby wrote in his dissenting opinion in *Harper v. Hall*:

> [T]he majority today wholeheartedly ushers this Court into a new chapter of judicial activism, severing ties with over two hundred years of judicial restraint in this area. . . . Undeterred, it untethers itself from history and caselaw.

380 N.C. 317, 434 (2022) (Newby, C.J., dissenting). As a member of the majority in the instant case, the Chief Justice's own words unwittingly and succinctly happen to apply to him and his counterparts of the majority in this case. I must dissent.

"All . . . will bear in mind this sacred principle, that though the will of the majority is in all cases to prevail, that will to be rightful must be reasonable; that the minority possess their equal rights, which equal law must protect, and to violate would be oppression." President Thomas Jefferson, First Inaugural Address (Mar. 4, 1801), available at https://avalon.law.yale.edu/19th_century/jefinau1.asp. Although the sentiment that all persons be afforded equal protection of the law was expressed early and often in the founding of our great republic, any substantive guarantee embedded in this provision did not come into fruition until much later in the respective histories of the nation and of this state. In particular, suffrage, a fundamental right that "is preservative of other basic civil and political rights," *Reynolds v. Sims*, 377 U.S. 533, 562 (1964), was explicitly restricted to white male property owners in North Carolina following the Constitutional Convention of 1835 and was not re-extended to Black people until 1868 following the conclusion of the Civil War and the beginning of Reconstruction.

Even then, Democrats, realizing that the interests of Blacks were better aligned with the Republican and Populist Parties at the time, began a campaign of racist rhetoric, violence, and outright fraud in order to regain a majority. J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* 188 (1974). Once in office, the legislators passed a law in 1899 that relocated the power to appoint election officers from local officials to a state election board selected by the General Assembly which

eventually became controlled by the Democrats. *Id.* at 190. The legislative body required voters to re-register and allowed registrars to disfranchise anyone as they saw fit. *Id.* In 1900, the Democratic General Assembly passed a constitutional amendment that required the completion of a literacy examination and payment of a poll tax in order to establish one's eligibility to vote. *Id.* at 190–95. As a result of this and other facially neutral measures,[2] which exempted men who were eligible to vote in 1867 or whose fathers or grandfathers were eligible to vote in 1867 (i.e., white men) and empowered county officials to act as gatekeepers by administering the highly subjective literacy tests, Black voter turnout plummeted, and the state remained under conservative control until the mid-twentieth century. *Id.*

After the Voting Rights Act of 1965 was passed as part of the American civil rights movement, North Carolina was forced to remove many barriers to voting that had been previously implemented throughout the state, including the aforementioned literacy examination.[3] The Act also required that certain counties across the United

---

[2] As the United States Supreme Court held in 1959, the state's literacy requirement did not, on its face, violate the Fifteenth Amendment by denying the right to vote on the basis of race. *Lassiter v. Northampton County Bd. of Elections*, 360 U.S. 45, 53 (1959). Noteworthily, Henry Frye, who was the first Black person to serve on this Court and who eventually became this Court's first Black Chief Justice, was denied the right to register to vote on the grounds that he was deemed to have failed this literacy test, even after graduating with highest honors from the collegiate institution now known as North Carolina Agricultural and Technical State University and after attaining the rank of Captain upon serving four years in the United States Air Force. Although he was declared unable to vote, he was accepted into the University of North Carolina School of Law and graduated with its law degree in 1959. *See* Adrienne Dunn, "Henry Frye," North Carolina History Project, https://northcarolinahistory.org/encyclopedia/henry-e-frye-1932/.

[3] Although the Voting Rights Act banned states from requiring the completion of literacy tests as a prerequisite to voting, the literacy requirement remains part of the state

States, including forty counties within North Carolina, obtain preclearance from the federal government before implementing any new election laws in order to ensure that any such laws would not be discriminatory in nature. A year later, registration of Black voters in North Carolina exceeded fifty percent for the first time since 1900. J. Morgan Kousser, *When African-Americans Were Republicans in North Carolina, The Target of Suppressive Laws Was Black Republicans. Now That They Are Democrats, The Target Is Black Democrats. The Constant Is Race* 14 (Apr. 17, 2014), https://www.aclu.org/sites/default/files/assets/lwv_expert_report_-_m__kousser.pdf. During this time, the General Assembly also passed a number of laws that had the effect of increasing access to voting, including laws that authorized early voting, out-of-precinct voting, same-day registration, and preregistration for teenagers. These efforts collectively boosted the registration of Black voters in the state by fifty percent and dramatically increased voter turnout, especially of Black voters. *Id.* at 17.

Nevertheless, state politics have remained racially polarized going into the twenty-first century, "offer[ing] a political payoff" for legislators to "dilute or limit the minority vote," *Holmes v. Moore*, 270 N.C. App. 7, 22 (2020) (extraneity omitted), since the disenfranchisement of Black voters "predictably redound[ed] to the benefit of one political party and to the disadvantage of the other." *N.C. State Conf. of the*

---

Constitution as a "not . . . particularly pleasing relic" of North Carolina's racial past. Michael Hyland, *Bipartisan measure aims to remove literacy requirement from North Carolina Constitution*, FOX 8 (Mar. 2, 2023), https://myfox8.com/news/politics/your-local-election-hq/bipartisan-measure-aims-to-remove-literacy-test-from-north-carolina-constitution/.

*NAACP v. McCrory,* 831 F.3d 204, 214 (4th Cir. 2016), *cert denied sub nom. North Carolina v. N.C. State Conf. of the NAACP,* 581 U.S. 985 (2017). For instance, after the United States Supreme Court invalidated the Voting Rights Act's preclearance requirements in 2013 through its decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), the North Carolina General Assembly rapidly put together an omnibus bill altering state election law that the Fourth Circuit determined was motivated, at least in part, by discriminatory racial intent. *McCrory*, 831 F.3d at 233. This law eliminated or curtailed many voter-friendly initiatives that had been introduced in the 1960s—including early voting, same-day registration, and preregistration—and included a provision that required voters to present photographic identification in order to vote in person. *Id.* at 214–17. The Fourth Circuit found that the state legislature had crafted this law with the knowledge and intent that it would disproportionately impact Black voters who disproportionately made use of those initiatives that the bill worked to curtail or eliminate, tended to lack the forms of identification deemed acceptable by the Republican General Assembly, and voted overwhelmingly for the Democratic Party. *Id.*

"Unquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular." *Id.* at 223. This historical reality is not one that anyone can legitimately deny, although the majority appears to represent in a footnote in its written opinion that the mere current presence of one Black man and one Black woman who were both elected to this Court, coupled with

other individuals expressly identified by the majority who are members of the Black race who have also been elected to office in North Carolina in modern times, proves that this state has progressed so much that this state's contemptible racial history regarding electoral politics bears no logical relation to its present-day political climate.[4] This naïveté, if such, would be appalling; this callousness, if such, would be galling.

Courts are not obliged to turn a blind eye to the historical circumstances that might inform present-day efforts to encumber, restrict, or otherwise discourage the exercise of the precious right to vote. An equilibrium between presuming legislative good faith, while remaining cognizant of the insidious nature of discriminatory intent as a potential motivation for facially neutral legislative acts, is precisely what was captured by the United States Supreme Court when it decided *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). In issuing its decision in *Arlington Heights*, the nation's highest court recognized that "[t]he historical background of [a legislative act] is one evidentiary source" relevant to discriminatory intent, "particularly if it reveals a series of official actions taken for invidious purposes." *Id*. at 267. While the Supreme Court has subsequently cautioned

---

[4] It is both noteworthy and instructive that legislation intended to limit suffrage along racial lines was specifically introduced as backlash to the election of Black legislators during the Reconstruction Era, indicating both that racial progress is not always linear and that political gains for minorities often precede conservative pushback to universal suffrage. Olivia B. Waxman, *The Legacy of the Reconstruction Era's Black Political Leaders*, Time (Feb. 7, 2022), https://time.com/6145193/black-politicians-reconstruction/.

that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful," *Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion), it remains the case that historical discrimination is a relevant factor in ascertaining the existence of present discriminatory intent. *Abbott v. Perez*, 138 S. Ct. 2305, 2351–52 (2018) (Sotomayor, J., dissenting).

My esteemed colleagues who constitute the majority granted petitioners' request for rehearing of this case on the grounds that a previous majority of this Court was deemed to have committed legal error by failing to afford the General Assembly its presumption of good faith in accordance with federal precedent. However, in an egregious twist and twirl, this Court obliterates its recognition of federal precedent altogether in order to introduce its own new standard of review for equal protection claims arising under the state Constitution. In doing so, this majority conveniently and haughtily spurns federal caselaw precedent fostered by the decision of the United States Supreme Court in *Arlington Heights*, while simultaneously upending decades of state constitutional principles, in its quest to shield acts of the state legislature from scrutiny for invidious discriminatory intent.

## I.     Background and Standard of Review

"Using race as a proxy for party may [still] be an effective way to win an election." *McCrory*, 831 F.3d at 222. Even in the absence of explicit "race-based hatred" or animus, "intentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes

discriminatory purpose." *Id.* Furthermore, racially neutral laws motivated by discriminatory intent are "just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *Id.* at 220. Because "[o]utright admissions of impermissible racial motivation are infrequent" in the contemporary context, *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999), courts must often make a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" when determining whether a legislative body has acted with discriminatory intent in violation of the state or federal constitution. *Arlington Heights*, 429 U.S. at 266.

In deciding *Arlington Heights*, the United States Supreme Court established a nonexhaustive list of factors that courts may consider probative on this question, including: (1) the historical background of the action; (2) the sequence of events leading up to its enactment, including any departures from the normal procedural or substantive operations of that legislative body; (3) the law's legislative and administrative history; and (4) whether the law's effect "bears more heavily on one race than another." *Id.* at 266–68. Discriminatory purpose "may often be inferred from the totality of the relevant facts," *Washington v. Davis*, 426 U.S. 229, 242 (1976), and courts do not consider "each piece of evidence in a vacuum," but the "totality of the circumstances" when ascertaining the presence of discriminatory intent. *McCrory*, 831 F.3d at 233. The Supreme Court has further provided that, because legislative bodies are "[r]arely . . . motivated solely by a single concern," a plaintiff

need only demonstrate that "invidious discriminatory purpose was a motivating factor" in the enactment of a piece of legislation, *Arlington Heights*, 429 U.S. at 265–66, before the burden shifts onto the legislature to demonstrate that "the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).[5] "[T]he ultimate question" then becomes whether a law was enacted "because of," rather than "in spite of," the discriminatory effect it would produce. *McCrory*, 831 F.3d at 220 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

As a preliminary matter, the case before us was brought under Article I, Section 19 of the Constitution of North Carolina, which provides that "No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin." N.C. Const. art. I, § 19. This provision "expressly incorporated" the Equal Protection Clause that had been "made explicit in the Fourteenth Amendment to the Constitution of the United States." *S. S. Kresge Co. v. Davis*, 277 N.C. 654, 660 (1971). As such, "[t]his Court's analysis of the State Constitution's Equal Protection Clause generally follows the analysis of the Supreme Court of the United States in interpreting the corresponding federal clause." *Blankenship v. Bartlett*, 363 N.C. 518, 522 (2009). "However, in the construction of the provision of the State Constitution, the meaning given by the Supreme Court of the United States to even an identical

---

[5] The initial burden of proof by which plaintiffs must demonstrate that racial discrimination was a motivating factor in the adoption of a facially neutral act under *Arlington Heights* is by a preponderance of the evidence. *Hunter*, 471 U.S. at 225.

term in the Constitution of the United States is, though highly persuasive, not binding upon this Court." *Bulova Watch Co. v. Brand Distribs. of N. Wilkesboro, Inc.*, 285 N.C. 467, 474 (1974). We maintain our authority to construe our state Constitution and its provisions separately from their federal analogues, so long as "our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel federal provision[s]." *Stephenson v. Bartlett*, 355 N.C. 354, 380–81 n.6 (2002) (quoting *State v. Carter*, 322 N.C. 709, 713 (1988)). The federal Constitution is a floor, below which we cannot sink. The majority ignores this fundamental principle.

In determining whether Senate Bill 824 violates Article I, Section 19 of the Constitution of North Carolina, this Court must accept any findings of fact made by the trial court as conclusive when supported by any competent evidence. When the trial court acts as factfinder, "the trial court's findings of fact . . . are conclusive on appeal if there is competent evidence to support them, even [if] the evidence could be viewed as supporting a different finding." *In re Estate of Skinner*, 370 N.C. 126, 139 (2017) (quoting *Bailey v. State*, 348 N.C. 130, 146 (1998)). Findings of fact that are "supported by competent, material and substantial evidence in view of the entire record[ ], are conclusive upon a reviewing court and not within the scope [of its] reviewing powers." *Id.* at 139 (alteration in original) (quoting *In re Revocation of Berman*, 245 N.C. 612, 616–17 (1957)). However, a trial court's conclusion as to whether a statute is constitutional, made in light of its findings of fact, is a question of law that this Court reviews de novo. *State v. Romano*, 369 N.C. 678, 685 (2017).

## II.     Discussion

"It is the state judiciary that has the responsibility to protect the state constitutional rights *of* the citizens; this obligation to protect the fundamental rights of individuals is as old as the State." *Corum v. UNC*, 330 N.C. 761, 783 (1992) (emphasis added). Rather than choosing to honor that duty, the majority instead strives to protect the state legislature *from* the citizens—first, by adopting a standard of proof for equal protection claims brought under Article I, Section 19 of the Constitution of North Carolina that unduly diminishes a claimant's ability to prevail and, second, by misconstruing federal precedent to neuter the sensitive inquiries specifically authorized under *Arlington Heights.*

### A.     The New Majority's Novel Standard of Proof

Throughout its opinion, the majority adopts an unprecedented burden of proof for claimants bringing equal protection claims arising under our state Constitution. Although the majority repeatedly characterizes its framework as traditional and consistent with the bulk of state authority, the depiction is, mildly put, a freewheeling exaggeration. In fact, the majority's new standard departs sharply from both federal *and* state precedent by abandoning the traditional equal protection framework and construing a provision of our state Constitution as providing lesser protection to citizens of our state than its federal analogue.

The majority cites numerous opinions of this Court for its assertion that facial constitutional challenges to an act of the legislature must be proven beyond a

reasonable doubt. *See State v. Strudwick*, 379 N.C. 94 (2021); *Cooper v. Berger*, 370 N.C. 392 (2018); *Hart v. State*, 368 N.C. 122 (2015); *Pope v. Easley*, 354 N.C. 544 (2001); *Baker v. Martin*, 330 N.C. 331 (1991). The majority implies that these cases establish some state-specific analytical jurisprudence that departs from the federal framework and supersedes *Arlington Heights*; however, none of these cases concern equal protection claims arising under Article 1, Section 19 of the Constitution of North Carolina. This is a crucial misfire because precedent specific to Article 1, Section 19 tends to favor identical construction to the Fourteenth Amendment. *See S. S. Kresge Co.,* 277 N.C. at 660 ("[T]he principle of the equal protection of the law, made explicit in the Fourteenth Amendment to the Constitution of the United States . . . has now been expressly incorporated in Art. I, § 19, of the Constitution of North Carolina . . . ."); *Blankenship*, 363 N.C. at 522 ("This Court's analysis of the State Constitution's Equal Protection Clause generally follows the analysis of the Supreme Court of the United States in interpreting the corresponding federal clause.").

Furthermore, state jurisprudence favors a more liberal construction of state constitutional provisions as compared to their federal analogues and disavows any construction that would afford citizens fewer protections than are afforded federally. *See Carter*, 322 N.C. at 713 ("[W]e have the authority to construe our own constitution differently from the construction by the United States Supreme Court of the Federal Constitution, *as long as our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel federal provision.*" (emphasis added)); *see also*

*Stephenson*, 355 N.C. at 380–81 (applying this principle to the Equal Protection Clause); *Corum*, 330 N.C. at 783 ("Our Constitution is more detailed and specific than the federal Constitution in the protection of the rights of its citizens."). The majority's decision flies in the face of this precedent by rejecting *Arlington Heights* on the grounds that it makes it too easy for citizens of this state to succeed on claims that legislative acts were enacted with discriminatory intent and thereby to assert their right to equal protection of the law.

The majority contends that its adoption of the "beyond a reasonable doubt" standard is justified by the pursuit of objectivity and consistency. Specifically, the majority appears to be gravely concerned that courts applying *Arlington Heights* might come to different conclusions concerning the constitutionality of the same legislative act. However, inconsistent outcomes are a regular byproduct of complicated, fact-intensive legal inquiries which appellate courts are presumably equipped to review. Furthermore, the entire purpose of *Arlington Heights* and its progeny is to empower plaintiffs alleging equal protection claims against legislation which appears neutral on its face to put forward "such circumstantial and direct evidence . . . as may be available" across a range of factors that the Supreme Court of the United States has deemed probative on the question of discriminatory intent. 429 U.S. at 266.[6] By the very nature of such claims, the evidence presented by plaintiffs

---

[6] Although the majority does not specifically state that its new legal framework disfavors the *Arlington Heights* factors as legitimate sources of evidence bearing on the issue of discriminatory intent, it does opine that evidence declared to be sufficient under the

in these types of cases will necessarily appear from sources other than the face of the challenged piece of legislation; consequently, different groups of plaintiffs challenging the same law may build entirely different records from which factfinders may derive entirely different factual findings upon which to base their legal conclusions. These circumstances are routine and do not justify the extreme departure from proven precedent which the majority cavalierly creates.

As if this new standard of proof were not enough to ensure its desired outcome, the majority imposes additional hurdles onto plaintiffs in the form of legal tests that are not ordinarily applied to equal protection claims. Specifically, the majority discusses the so-called *Salerno* test, which establishes that an individual challenging the facial constitutionality of a legislative act "must establish that no set of circumstances exist under which the [a]ct could be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also State v. Bryant*, 359 N.C. 554, 564 (2005). However, this test is rarely applied as strictly as it was conceived, *see Washington v. Glucksberg*, 521 U.S. 702, 740 (1997) (Stevens, J., concurring), and is barely applied at all in several areas of constitutional law, including Equal Protection Clause jurisprudence. *See* Alex Kreit, *Making Sense of Facial and As-Applied Challenges*, 18 Wm. & Mary Bill Rts. J. 657, 659–65 (2010); Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 238–39 (1994). To the extent that

---

*Arlington Heights* framework is "by its very nature speculative" and open to subjective interpretation.

this Court has previously cited *Salerno*, it has never been within the context of an equal protection claim. Finally, the United States Supreme Court itself has questioned the ongoing viability of this aspect of *Salerno* altogether. *See City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself . . . .").

## B.     The Majority's Abuse of *Abbott* and *Raymond*

Unsatisfied with its ability to eschew the federal framework for one which all but guarantees the state legislature's indemnity from plaintiffs' pesky claims of racial discrimination, the majority attempts to extract overly broad legal principles from two federal decisions that, as it acknowledges, are not binding on this Court and were cabined by their own records on appeal in order to claim that the trial court's analysis not only faltered under this Court's entirely new state standard, but also under a traditional application of *Arlington Heights*. However, neither case stands for such a sweeping proposition as the majority would assign to it and, in fact, both cases happen to expressly acknowledge historical context as a permissible source of insight into present legislative intent. Furthermore, both the United States Supreme Court in *Abbott*, as well as the Fourth Circuit in *Raymond*, were confronted with trial court findings that were distinctly and thoroughly flawed by the misapplication of the proper burden of proof. In the absence of such error by the trial court in the present

case, the majority's effort to analogize the trial court's decision in this case with those presented in *Abbott* and *Raymond* falls flat.

> i.      *The United States Supreme Court's Decision in* Abbott v. Perez

In *Abbott*, the United States Supreme Court reversed in part the decision of a three-judge panel sitting in the Western District of Texas, finding that the redistricting plans adopted by the 2013 Texas Legislature had not been "cured" of the unlawful discriminatory intent that had been previously found in the plans adopted by the Texas Legislature in 2011. 138 S. Ct. at 2313. The *Abbott* Court held that the district court had "committed a fundamental legal error" by requiring "the State to show that the 2013 Legislature somehow purged the 'taint' that the court attributed to the defunct and never-used plans enacted by a prior legislature in 2011." *Id.* at 2313, 2324. The Supreme Court acknowledged that *Arlington Heights* applied, and that the historical background of the 2013 redistricting plans was relevant to the question of whether they were enacted with discriminatory intent; however, it also emphasized that a finding of past discrimination alone did not justify shifting the burden of proof from plaintiffs to the State. *Id.* at 2324. The high Court therefore concluded that "the essential pillar of the three-judge court's reasoning was critically flawed" and that, reviewed under the "proper legal standards," all but one of the legislative districts were lawful. *Id.* at 2313–14.

The *Abbott* Court determined that, aside from the legislative body's prior bad acts, both the direct and circumstantial evidence did not support the district court

panel's conclusion that the 2013 Texas Legislature had acted with discriminatory intent. *Id.* at 2327. The Supreme Court credited the fact that the 2013 redistricting plans had been approved and adopted by the three-judge court itself, and that the state attorney general had advised the 2013 Legislature that adopting these plans was the easiest way to bring legal challenges to a close as "expeditiously as possible," thus indicating the legislature's legitimate intent to adopt court-approved plans as a means of ending litigation. *Id.* at 2313, 2327. Meanwhile, it discredited the federal district court's inferences of unlawful intent as unsound and without supporting evidence. *Id.* at 2327–29. As such, the *Abbott* Court opined that the federal district court's inappropriate reallocation of the burden of proof onto the State was "central" to its analysis, noting that the lower court had

> referred repeatedly to the 2013 Legislature's duty to expiate its predecessor's bad intent, and when the court summarized its analysis, it drove the point home. It stated: "The discriminatory taint [from the 2011 plans] was not removed by the Legislature's enactment of the Court's interim plans, because the Legislature engaged in no deliberative process to remove any such taint, and in fact intended any such taint to be maintained but be safe from remedy."

*Id.* at 2325–26 (alteration in original) (quoting *Perez v. Abbott*, 274 F. Supp. 3d 624, 649 (W.D. Tex. 2017)). Having concluded that the plaintiffs had not met their burden of proof to demonstrate discriminatory intent under the correct legal standard except in the case of one district which had a design explicitly predicated on race, the Court reversed in part, affirmed in part, and remanded to the trial court. *Id.* at 2335.

The majority strains to construe *Abbott* as impacting the present case in at least two ways. First, the majority misconstrues the directive in *Abbott* that a finding of past discrimination cannot *alone* justify reallocating the burden of proof from plaintiffs onto the State as indicating that the trial court's findings in the present case, considering the historical background of Senate Bill 824, had *no* bearing on the intent of the legislature which had passed it. Second, the majority regards *Abbott* as permission for this Court to entirely disregard the second prong of *Arlington Heights* absent a finding that the General Assembly here not only deviated from its normal operating procedures but deviated so grossly as to have acted outside of its legitimate constitutional power. However, the United States Supreme Court's holding in *Abbott* cannot legitimately be stretched by the majority to substantiate the liberties which it takes with the high court's instructive reasoning in *Abbott.*

First, the *Abbott* Court's holding that the federal district court had improperly flipped the burden of proof was neither based on the lower court's mere consideration of the law's historical background, nor stray references to a prior legislature's discriminatory intent or knowledge of the plans' potential discriminatory impact. Indeed, the Supreme Court in *Abbott* fully recognized the relevancy of the 2013 redistricting plans' historical background, including the prior finding of discrimination on the part of the 2011 Legislature:

> In holding that the District Court disregarded the presumption of legislative good faith and improperly reversed the burden of proof, *we do not suggest either that the intent of the 2011 Legislature is irrelevant* or that the

> plans enacted in 2013 are unassailable because they were previously adopted on an interim basis by the Texas court. *Rather, both the intent of the 2011 Legislature and the court's adoption of the interim plans are relevant to the extent that they naturally give rise to—or tend to refute—inferences regarding the intent of the 2013 Legislature.* They must be weighed together with any other direct and circumstantial evidence of that Legislature's intent. But when all the relevant evidence in the record is taken into account, it is plainly insufficient to prove that the 2013 Legislature acted in bad faith and engaged in intentional discrimination.

*Id*. at 2326–27 (emphases added). Justice Sotomayor's dissent in *Abbott* credits the majority for exactly this distinction, noting that the majority opinion "does not question the relevance of historical discrimination in assessing present discriminatory intent. Indeed, [it] leaves undisturbed the longstanding principle recognized in *Arlington Heights* that the historical background of a legislative enactment is one evidentiary source relevant to the question of intent." *Id*. at 2351–52 (Sotomayor, J., dissenting) (extraneity omitted).

Instead, the holding in *Abbott* reflects the fact that the federal district court in that case had allowed the previous legislature's intent not only to invade its considerations of the other *Arlington Heights* factors, but also to dictate the lower court's findings at each stage by requiring the legislature to affirmatively prove that it had cured the discriminatory taint of the prior legislative body. *See Perez*, 274 F. Supp. 3d at 648. It would be nearly impossible to disentangle the *Perez* court's factual findings from its improper legal framework because, as the federal district court itself explicitly stated, it conducted its analysis believing that the "most important

consideration [was] whether the 2011 plans continue[d] to have discriminatory or illegal effect, and whether the [2013] reenactment further[ed] that existing discrimination." *Id.* The Supreme Court addressed this misconception in deciding that the lower court had committed legal error, unequivocally declaring that: "[u]nder these circumstances, there can be no doubt about what matters: It is the intent of the 2013 Legislature. And it was the plaintiffs' burden to overcome the presumption of legislative good faith and show that the 2013 Legislature acted with invidious intent." *Abbott*, 138 S. Ct. at 2325.

Conversely, the trial court made no such legal error in the present case. The tribunal correctly identified the applicable legal framework as supplied by *Arlington Heights* and accurately acknowledged throughout that plaintiffs bore the initial burden of proving that Senate Bill 824 was enacted with discriminatory intent before defendants would ever be required to demonstrate that the law would have been enacted absent discrimination as a motivating factor. Unlike the federal district court in *Perez*, the trial court in this case never contemplated that the primary consideration might be the intent of the prior legislature that had passed the previous voter identification provision; indeed, it never strayed from its objective to determine the intent of the legislature which passed Senate Bill 824 using the factors provided by *Arlington Heights*. While, in its thorough analysis, the trial court referenced both the previous voter identification law, House Bill 589—and the Fourth Circuit's decision in *McCrory* that had determined that House Bill 589 was itself passed with

discriminatory intent—the trial court appropriately did so by properly considering House Bill 589 as part of the overall historical background leading up to Senate Bill 824 and by using *McCrory*'s analysis of House Bill 589 in order to guide its own analysis of Senate Bill 824 rather than to dictate its outcome.

The majority ascribes much significance to one of the trial court's numerous subheadings in the lower forum's issued order: "The Design of S.B. 824 Does Not Evince an Intent by the General Assembly to Cure Racial Disparities Observed Under H.B. 589." This organizational entry, and the trial court's subsequent analysis appearing under the section, do not constitute an improper reallocation of the burden of proof onto defendants. In this portion of its order, the trial court rejects some of defendants' counterarguments as to why and how the legislative history of Senate Bill 824 did not raise "additional red flags." Before reaching this section, as well as the one immediately following it which concluded that the "Limited Democratic Involvement in Enacting S.B. 824 [Did] Not Normalize the Legislative Process," however, the trial court specifically found that Senate Bill 824 had been enacted in an unusually expeditious process, leaving little time for concerns to be addressed about the law's impact on minority voters. The trial court further specifically found that amendments to the legislative bill that were proposed which might have benefitted Black voters were rejected and not incorporated into the final law. In the aforementioned category of the trial court's order, the tribunal acknowledged that Senate Bill 824 included forms of qualifying identification which were not included

in House Bill 589 before concluding that the General Assembly did not "consider any updated racial demographic data prior to the enactment of S.B. 824" and, therefore, could not be credited with actively persevering to reduce the known racial impact of requiring voters to present photographic identification. This segment of the trial court's order did not directly ascribe the *discriminatory intent* of the legislature that had passed House Bill 589 to the legislature that had passed Senate Bill 824; instead, it recognized the known disparate impact of a photographic identification requirement to vote, evidenced in part by data from the implementation of House Bill 589; the fact that those amendments that would specifically assist Black voters in accessing the franchise despite such a requirement were rejected by the General Assembly; and that those additional forms of identification that were integrated into the final law were not fashioned to alleviate the law's disparate racial impact. All of these findings by the trial court were supported by competent evidence and should have been taken as conclusive on appeal.

The majority also cites *Abbott* for the majority's proposition that a speedy legislative process cannot give rise to an inference of bad faith. In *Perez*, the federal district court found that the 2013 Texas Legislature "pushed the redistricting bills through quickly in a special session." 274 F. Supp. 3d at 649. The federal district court noted that the Texas Attorney General had urged the legislature to adopt the redistricting plans during the regular session, but that the regular session ended in May 2013 with no redistricting action, whereupon the Governor of Texas called a

special session to consider legislation ratifying and adopting the court-approved redistricting plans. *Id.* at 634. On this point, the United States Supreme Court provided that:

> we do not see how the brevity of the legislative process can give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith . . . . The "special session" was necessary because the regular session had ended. As explained, the Legislature had good reason to believe that the interim plans were sound, and the adoption of those already-completed plans did not require a prolonged process. After all, part of the reason for adopting those plans was to avoid the time and expense of starting from scratch and leaving the electoral process in limbo while that occurred.

*Abbott*, 138 S. Ct. at 2328–29. The majority clings to this snippet from *Abbott* in an effort to discredit the trial court's findings that the sequence of events leading to the enactment of Senate Bill 824 was unusual and "[m]arked by [d]epartures from [n]ormal [l]egislative [p]rocedure."

However, the relevant inquiry under *Arlington Heights* is not whether a challenged action was adopted after a brief legislative process as opposed to a lengthy one; rather, *Arlington Heights* directs courts to consider "[d]epartures from the normal procedural sequence." 429 U.S. at 267. Cases applying the *Arlington Heights* factors suggest that an actor's "normal procedural sequence" should be defined by the procedural norms of that particular entity. *See, e.g. Familias Unidas Por La Educación v. El Paso Indep. Sch. Dist.*, 2022 U.S. Dist. LEXIS 180846 at *23–25 (W.D. Tex. 2022) (finding that the public school district had deviated from *its* typical

procedures by failing to involve community members in its decision to close three elementary schools); *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, 641 F. Supp. 2d 563, 573–74 (E.D. La.) (finding that the St. Bernard Parish and Parish Counsel deviated from the normal process for enacting a moratorium in relation to a proposed construction project by not involving a variance and not being limited in scope); *see also Normal, Black's Law Dictionary* (6th ed. 1990) (defining "normal" as "[a]ccording to, constituting, or not deviating from an established norm"). Furthermore, a deviation from a legislature's normal operating procedure does not automatically constitute a violation of the legislature's defined procedural rules, and therefore certainly not constitutional constraints. *McCrory*, 832 F.3d at 228 ("But, of course, a legislature need not break its own rules to engage in unusual procedures.").

In *Perez*, the federal district court made no findings from which it or an appellate court could determine whether a convention of a legislative special session for the purpose of considering and adopting court-approved redistricting plans was outside of the Texas Legislature's normal operating procedures. 274 F. Supp. 3d 624. As the United States Supreme Court held, the "brevity" of the legislative process in that case was not enough to give rise to an inference of bad faith alone, especially considering the legislature's reason to believe that the court-issued redistricting plans were sound and the law-making body's motivation to avoid an indefinite disruption of the electoral process. *Abbott*, 138 S. Ct. at 2328–29. The circumstances in *Abbott* are readily distinguishable from the situation in the present matter, where

the trial court made multiple findings that directly addressed the North Carolina General Assembly's normal operating procedures and the legislative body's deviation therefrom during both the enactments of House Bill 1092—the constitutional amendment requiring voters to produce photographic identification in order to vote— and Senate Bill 824 as its implementing legislation. Instead of accepting these findings as binding and relevant to its *Arlington Heights* analysis, the majority proposes in its opinion here that *any* consideration of procedural abnormalities, short of the legislature plainly acting outside of its constitutional authority, amount to judicial overreach into the legislative process and consequently squelch the viability of this *Arlington Heights* factor in North Carolina.

ii.     *The Fourth Circuit's Decision in* NAACP v. Raymond

As with *Abbott*, the majority here also labors to contort the Fourth Circuit's decision in *Raymond*. In *Raymond*, the Fourth Circuit reviewed a decision of the United States District Court for the Middle District of North Carolina which granted the plaintiffs' motion for a preliminary injunction enjoining the enforcement of Senate Bill 824 under the federal Equal Protection Clause. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 298 (4th Cir. 2020), *rev'g N.C. State Conf. of the NAACP v. Cooper*, 430 F. Supp. 3d 15 (M.D.N.C. 2019). The Fourth Circuit reversed the federal district court, finding that the lower court had "improperly disregarded" the principle that a legislature's "discriminatory past" cannot be used to condemn its later acts, by "reversing the burden of proof and failing to apply the presumption of legislative good

faith." *Id.* Specifically, the Fourth Circuit determined that the federal district court had "considered the General Assembly's discriminatory intent in passing the 2013 Omnibus Law to be effectively dispositive of its intent in passing the 2018 Voter-ID Law." *Id.* at 302. The Fourth Circuit analogized to *Abbott*, finding that:

> The district court here made the same mistake as the panel in *Abbott* without even trying to distinguish the Supreme Court's holding. Explaining that it is " 'eminently reasonable to make the State bear the risk of non-persuasion with respect to intent' when the very same people who passed the old, unconstitutional law passed the new," *Cooper*, 430 F. Supp. 3d at 32, the district court noted that the General Assembly did not "try[] to cleanse the discriminatory taint," *id.* at 43, or "tak[e] steps to purge the taint of discriminatory intent," *id.* at 35. . . . These were not merely "stray comments." *Abbott*, 138 S. Ct. at 2325. "On the contrary, they were central to the court's analysis," *id.*, for they made explicit the burden-shifting that the court engaged in while assessing the *Arlington Heights* factors.

*Id.* at 303 (first and second alterations in original). The Fourth Circuit also observed that the federal district court repeatedly referenced the fact, throughout its *Arlington Heights* analysis, that the legislature that enacted Senate Bill 824 was largely composed of the same legislators who had passed House Bill 589. *Id.* at 304–05; *see Cooper*, 430 F. Supp. 3d at 31 ("Plaintiffs' more potent sequence-related argument is less about 'how' than 'who.' "); *Cooper*, 430 F. Supp. 3d at 35 ("[T]he legislative history reveals that the General Assembly's goals and motivations went virtually unchanged in the time between H.B. 589 and S.B. 824. Rather than taking steps to purge the taint of discriminatory intent, the bill's supporters expressed their resolve to circumvent *McCrory* and stave off future legal challenges.").

Just as the United States Supreme Court did in *Abbott*, the Fourth Circuit in

*Raymond* comprehensively explained that the historical discrimination exhibited by

the General Assembly that had enacted House Bill 589 *was* a relevant factor in

discerning the existence of present discriminatory intent on the part of the General

Assembly that had passed Senate Bill 824. *Raymond*, 981 F.3d at 305. The federal

appellate court cautioned:

> None of this suggests that the 2013 General Assembly's discriminatory intent in enacting the 2013 Omnibus Law is irrelevant. *See Abbott*, 138 S. Ct. at 2327. But the appropriate place to consider the 2013 Omnibus Law is under the "historical background" factor. *See Arlington Heights*, 429 U.S. at 267; *see also Abbott*, 138 S. Ct. at 2325 (finding that the historical background leading to the law's enactment is but " 'one evidentiary source' relevant to the question of intent" (quoting *Arlington Heights*, 429 U.S. at 267)). And yet the "historical background" section is the one part of the district court's discriminatory-intent analysis where the court did not discuss the 2013 Omnibus Law.

*Id.* at 305. Finding that the federal district court's legal errors had "fatally infected"

its findings, the Fourth Circuit reviewed the remaining evidence and determined

that, aside from historical background, the remaining factors of *Arlington Heights* did

not support a finding of discriminatory intent. *Id.* at 303. Specifically, the Fourth

Circuit acknowledged the federal district court's finding that there were no

procedural irregularities leading up to the enactment of Senate Bill 824 and that

minority voters disproportionately lacked the forms of identification required by the

law before the federal appellate court determined that the federal district court had

erred in discrediting the bill's bipartisan support, the impact of the intervening constitutional amendment, and the effect of the law's mitigating features. *Id.* at 305–10. The Fourth Circuit therefore reversed, explaining that it did not do so because the federal district court weighed the available evidence differently than the federal appellate court would have, but instead because "of the fundamental legal errors that permeate[d] the [lower court's] opinion." *Id.* at 310–11.

As a previous composition of this Court noted, *Raymond* was decided in an entirely different procedural posture and on an entirely different factual record. As the trial court in the instant case acknowledged, quoting *Holdstock v. Duke University Health System,* 270 N.C. App. 267, 280 (2020), "the [C]ourt of [A]ppeals cannot ask questions that might help resolve issues or prompt responses necessary to create a complete record." For this reason, appellate courts rely upon the trial courts to develop sufficient factual records from which the higher tribunals can make their own determinations upon appellate review; furthermore, an appellate court's determinations will necessarily be premised upon the presence or absence of sufficient record evidence, as opposed to some abstract absolute truth. Whereas the trial court's decision here was based on a full and final record developed after the completion of a three-week bench trial, the federal district court in *Cooper* issued its opinion based upon a preliminary pretrial record and without the benefit of much of the evidence that was provided to the trial court in this case.

As a result, the federal district court's findings of fact, upon which the Fourth Circuit based its own review, differed significantly from those made by the trial court in the present case. For example, while the federal district court in *Cooper* found that the events leading up to the passage of Senate Bill 824 lacked any "procedural irregularity," 430 F. Supp. 3d at 32, the trial court in *Holmes* made numerous findings on the irregularities leading up to the enactments of both House Bill 1092 and Senate Bill 824 based upon expert testimony that the federal district court in *Cooper* did not receive. Likewise, the trial court here received and credited expert testimony discussing the disproportionate impact that Senate Bill 824's reasonable impediment provisions would have on Black voters that was unavailable to the federal district court in *Cooper*, and therefore to the Fourth Circuit in *Raymond*.

The trial court's findings in this case flowed directly from the evidentiary record before it, rather than from an improperly inverted assignment of the burden of proof. Whereas the federal district court's analysis in *Cooper* repeatedly paralleled the *Perez* court's improper legal standard nearly verbatim, the trial court in this case never ascribed the "discriminatory taint" of House Bill 589 to the legislature that had passed Senate Bill 824. *Compare Cooper,* 430 F. Supp. 3d at 43 ("[R]ather than trying to cleanse the discriminatory taint which had imbued H.B. 589, the legislature sought ways to circumvent state and federal courts and further entrench itself."), and *Cooper*, 430 F. Supp. 3d at 35 ("Rather than taking steps to purge the taint of discriminatory intent, the bill's supporters expressed their resolve to circumvent *McCrory* and stave

off future legal challenges."), *with Perez*, 274 F. Supp. 3d at 649 ("Further, the Legislature did not engage in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans."). By contrast, the majority decision here largely relies upon one instance in which the trial court supposedly inverted the evidentiary burden; namely, where the trial court had found that Senate Bill 824's substantive departures from House Bill 589 were not made for the purpose of alleviating the racially disparate *impact* that had been previously observed under House Bill 589. In doing so, the trial court did not, however, ascribe the previous legislature's *intent* to that legislative body which had passed Senate Bill 824, nor did it purport by its order that defendants were required to cleanse, purge, or cure any discriminatory intent which had traversed from House Bill 589 to Senate Bill 824.

For these reasons, inasmuch as the Fourth Circuit's decision in *Raymond* was explicitly based on the federal district court's "fundamental legal errors that permeate[d] the opinion," 981 F.3d at 311, and a full consideration of the particular evidentiary record before the Fourth Circuit, *Raymond* provides no meaningful grist for the majority's mill: the trial court's findings were derived from an entirely different and more extensive evidentiary record, and the trial court never required defendants to prove that they had purged Senate Bill 824 of the discriminatory taint of House Bill 589.

## C. The Majority's Reconsideration of the Evidence

The remainder of the majority's opinion engages in an improper and self-serving reweighing evaluation of the evidence presented to the trial court which bears on disparate impact. While it is elementary that reweighing evidence upon appellate review is fundamentally wrongful, the egregiousness of the majority's act is particularly pronounced since the case is back on *rehearing*. The correct standard of review for a trial court's findings of fact is highly deferential. "[T]he trial court's findings of fact . . . are conclusive on appeal if there is competent evidence to support them, even [if] the evidence could be viewed as supporting a different finding." *In re Estate of Skinner*, 370 N.C. at 139 (quoting *Bailey*, 348 N.C. at 146). Findings of fact "supported by competent, material and substantial evidence in view of the entire record[ ], are conclusive upon a reviewing court and not within the scope [of its] reviewing powers." *Id.* at 139 (alteration in original) (quoting *In re Revocation of Berman*, 245 N.C. at 616–17). Furthermore, a finding of "overwhelming" disparate impact is not required under *Arlington Heights*. *McCrory*, 831 F.3d at 231. Instead, the pertinent inquiry is merely whether Senate Bill 824 "bears more heavily" on Black voters. *Arlington Heights*, 429 U.S. at 266 (quoting *Washington*, 426 U.S. at 242).[7] In

---

[7] The majority repeatedly cites cases which consider whether state legislative acts imposed a "substantial burden" upon the right to vote through requirements related to voter identification. Notably, these analyses occurred not under *Arlington Heights* but under separate constitutional principles which limit legislatures' ability to encumber exercise of the constitutionally protected right to vote even when acting without racially discriminatory purpose. *See, e.g., Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 605–06 (4th Cir. 2016); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190–91 (2008). Although these cases have some bearing on what types of voter-related requirements and restrictions have been determined to be facially unconstitutional, they do not stand for the proposition that

other words, whether the law actually "produces disproportionate effects." *Hunter*, 471 U.S. at 227;[8] *see also McCrory*, 831 F.3d at 231 ("[T]he district court's findings that African Americans . . . disproportionately lacked the photo ID required by SL 2013-381, if supported by the evidence, establishes sufficient disproportionate impact for an *Arlington Heights* analysis.").

Here, the trial court received evidence over the course of a three-week trial which included extensive expert testimony before determining that (1) Black voters were more likely to lack qualifying forms of identification than white voters and (2) the burdens of obtaining qualifying forms of identification and navigating the reasonable impediment process fell more heavily upon Black voters than white voters. Plaintiffs' expert Professor Kevin Quinn showed that, similar to House Bill 589, Senate Bill 824 was very likely to have a disproportionate impact on Black voters, who were approximately 39% more likely than white voters to lack qualifying forms of identification; when the professor's data analysis was restricted to active voters, Black voters were more than twice as likely to lack qualifying identification

---

claimants under *Arlington Heights* must demonstrate the imposition of a substantial burden along racial lines.

[8] In its newly proposed standard, the majority contends that the relevant inquiry is whether a law produces a *meaningful* disparate impact along racial lines, separate and apart from the court's determination of whether the legislature acted with discriminatory intent. It is unclear what, if any, additional burden this standard imposes upon plaintiffs, but this too is a departure from *Arlington Heights*, which provided discriminatory effect as one relevant but not all-consuming factor in its constitutional analysis. 429 U.S. at 265 (holding that, although not "irrelevant," disproportionate impact is "not the sole touchstone of an invidious racial discrimination" (quoting *Washington*, 426 U.S. at 242)).

as white voters. A majority of this Court concludes that Professor Quinn's evidence was "fatally deficient" because he was unable to access data concerning *all* forms of qualifying identification[9] even though he testified that, while accounting for these forms of identification would likely decrease the absolute number of individuals lacking any form of qualifying identification as defined by Senate Bill 824, the ultimate racial disparity was likely to be even greater than originally estimated.[10] The trial court also heard testimony indicating that Senate Bill 824's ameliorative provisions failed to sufficiently mitigate the law's disparate impact on Black people. The trial court considered and credited evidence from the implementation of House Bill 589 which indicated that the bill's similar reasonable impediment provision had not been "uniformly provided to voters" and that the reasonable impediment process was "susceptible to error and implicit bias." To this end, the trial court found that those voters whose ballots were not counted were "much more likely" to be Black than the electorate's ballots as a whole. Finally, the trial court specifically discounted the testimony of defendants' experts as unpersuasive and incapable of rebutting the abovementioned findings.

---

[9] Specifically, Professor Quinn was unable to acquire identification databases for passports, military IDs, and veterans' IDs. He noted that these databases, by their very nature, contain highly confidential information and are not typically available for access.

[10] This is due to the fact that these forms of identification are more likely to be held by whites than Blacks; for example, the trial court found that white voters are 2.4 times as likely to possess unexpired passports as Black voters.

In order to posit that these findings were not supported by competent evidence, the majority usurps the trial court's fact-finding function through its own credibility determinations and assigning its own weights to the plethora of evidence presented to the trial court. Where the majority cannot legitimately deny the trial court's statistical findings, the majority simply determines them to be overstated. In doing so, the majority both abandons the applicable standard of review and inflates plaintiffs' burden under *Arlington Heights. See In re I.K.,* 377 N.C. 417, 426 (2021) ("[T]his Court reviews the trial court's order to determine whether competent evidence supports the finding of fact and cannot reweigh the evidence when making this determination."); *In re J.A.M.,* 372 N.C. 1, 11 (2019) (holding that because "the trial court is uniquely situated to make . . . credibility determination[s] . . . appellate courts may not reweigh the underlying evidence presented at trial").

## III.    Conclusion

Our precedent, stretching back nearly 150 years into this Court's history, makes it exceedingly clear that those few and distinguished cases brought back before the Court for rehearing ought to be reconsidered only with tremendous caution.[11]

---

[11] *See Watson v. Dodd*, 72 N.C. 240, 240 (1875) ("The weightiest considerations make it the duty of the Courts to adhere to their decisions. No case ought to be reversed upon petition to rehear, unless it was decided hastily, or some material point was overlooked, or some direct authority was not called to the attention of the Court."); *Weisel v. Cobb*, 122 N.C. 67, 69 (1898) ("As the highest principles of public policy favor a finality of litigation, rehearings are granted by us only in exceptional cases, and then every presumption is in favor of the judgment already rendered."); *Hicks v. Skinner*, 72 N.C. 1, 2 (1875) ("[U]nless we have clearly mistaken some important fact, or overlooked some express and weighty

Indeed, every presumption is construed in favor of the Court's previous holding, and we allow ourselves to upset our previous judgment if, and only if, we are able to determine that the previous majority either clearly mistook some important fact or overlooked an express and weighty authority in contradiction to its prior ruling. This principle exists precisely to ensure that the Court's judgments are not subject to immediate reversal upon a change in the direction of political winds. *See Weisel*, 122 N.C. at 70; *Devereux v. Devereux*, 81 N.C. 12, 16–17 (1879). Rather than abide by that lofty philosophy which has always permeated the fabric of this Court, the majority instead prefers to dismember both state and federal jurisprudence in order to demonstrate its alacrity to brandish its audacity to achieve its purposes, all while claiming to act in the name of judicial restraint. Perhaps the Chief Justice said it best when he once chose to dissent from a majority opinion of this Court when decrying judicial activism: "The ultimate damage to our jurisprudence and public trust and confidence in our judicial system is yet to be determined." *Robinson*, 375 N.C. at 214 (Newby, J., dissenting).

For these reasons, I respectfully dissent.

Justice EARLS joins in this dissenting opinion.

---

authority, we must adhere to our decisions. We consider every case with care, and decide nothing with a venture.").